**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NAOKO OHNO, an individual, *Plaintiff-Appellee*, | No. 11-55081 |
| | D.C. No. 2:10-cv-06400-ODW-PJW |
| v. | |
| YUKO YASUMA, an individual; SAINTS OF GLORY CHURCH, a California corporation, *Defendants-Appellants*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, District Judge, Presiding

Argued and Submitted
May 9, 2012—Pasadena, California

Filed July 2, 2013

Before: Harry Pregerson, Susan P. Graber,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

# SUMMARY[*]

## Diversity/California's Uniform Foreign-Country Money Judgments Recognition Act

The panel affirmed the district court's judgment in favor of plaintiff awarding her, pursuant to California's Uniform Foreign-Country Money Judgments Recognition Act, Cal. Civ. Proc. Code §§ 1713–1724, monetary relief ordered by the courts of Japan.

Plaintiff sued Yuko Yasuma and the Saints of Glory Church (collectively, "the Church") in Japan, alleging that they had tortiously induced her to transfer nearly all of her assets to the Church. The Japanese courts awarded plaintiff a $1.2 million tort judgment. Plaintiff sought enforcement of the judgment in the United States District Court for the Central District of California. The Church asserted that the district court was both constitutionally and statutorily required to refuse recognition of the Japanese judgment because (1) the judgment burdened free exercise of religion in violation of the Religion Clauses; and (2) the judgment was not entitled to recognition or enforcement under the Uniform Act, because it was "repugnant to the public policy" embodied in the Religion Clauses.

The panel held: first, the district court's enforcement of this foreign-country money judgment did not constitute domestic state action triggering constitutional scrutiny; and, second, neither the judgment at issue in this particular case

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

nor the cause of action on which it was based was so repugnant to public policy as to qualify for non-enforcement under the Uniform Act.

## COUNSEL

Steven J. Renick (argued), Eugene J. Egan, Paul Hanna, and Ladell Hulet Muhlestein, Manning & Kass Ellrod, Ramirez, Trester, Los Angeles, California, for Defendants-Appellants.

Robert W. Cohen (argued) and Mariko Taenaka, Law Offices of Robert W. Cohen, Los Angeles, California, for Plaintiff-Appellee.

## OPINION

BERZON, Circuit Judge:

Our case involves novel issues concerning the enforcement of foreign-country money judgments that assertedly implicate the defendant's freedom of religion. Naoko Ohno sued Yuko Yasuma and the Saints of Glory Church (collectively, "the Church") in Japan, alleging that they had tortiously induced her to transfer nearly all of her assets to the Church. The Japanese courts awarded Ohno a $1.2 million tort judgment.

The Church contends that the judgment imposes liability for its religious teachings, in violation of its constitutional

right to free exercise of religion.[1]  The Church makes two principal arguments on appeal: (1) that the district court's recognition and enforcement[2] of the Japanese judgment is unconstitutional as a direct violation, by the court, of the Free Exercise Clause in the U.S. Constitution and the parallel provisions of the California Constitution, U.S. Const. amend. I; Cal. Const. art. I, § 4;[3] and (2) that the Japanese judgment

---

[1] Although the Church raises both free speech and free exercise claims, the speech at issue was either religious in content or, allegedly, motivated by religious beliefs.  While "private religious speech . . . is as fully protected under the Free Speech Clause as secular private expression . . . [it] receives *preferential* treatment under the Free Exercise Clause." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760, 767 (1995).  Because the right to religious freedom affords a higher degree of protection than would the Free Speech Clause in this case, we analyze the Church's claims under the Free Exercise Clause of the U.S. Constitution and corresponding provisions of the California Constitution, Article I, Section 4, not separately under the free speech provisions.

[2] The terms "recognition" and "enforcement" are distinct.  *See* Restatement (Third) of Foreign Relations Law § 481 cmt. b (1987). Recognition of a judgment is a prerequisite to its enforcement.  In recognizing a judgment, a court acknowledges that a matter has been conclusively adjudicated and that the judgment may have preclusive effect.  In enforcing a judgment, a court "uses its coercive powers to order the relief granted by the foreign court."  Office of the Chief Counsel for International Commerce, U.S. Dep't of Commerce, *Recognition and Enforcement of Foreign Money Judgments* http://www.osec.doc.gov/ogc/occic/refmj.htm (last visited May 29, 2013).  As the distinction between the two concepts is not pertinent for the purposes of this opinion, we use the terms recognition and enforcement interchangeably to denote the district court's decision to enter judgment in favor of Ohno, awarding her the monetary relief ordered by the courts of Japan.

[3] Throughout this opinion, we refer to the Free Exercise Clause of the U.S. Constitution and the corresponding protections of religious freedom in the California Constitution as "the Religion Clauses."

is not entitled to recognition or enforcement under California's Uniform Foreign-Country Money Judgments Recognition Act, Cal. Civ. Proc. Code §§ 1713–1724 ("Uniform Act"), because it is "repugnant to the public policy" embodied in the Religion Clauses.

We hold, first, that the district court's recognition and enforcement of the Japanese money judgment does not constitute "state action" triggering direct constitutional scrutiny and, second, that neither the Japanese judgment nor the cause of action on which it was based rises to the level of repugnance to the public policy of California or of the United States that would justify a refusal to enforce the judgment under the Uniform Act. Accordingly, we affirm the district court's judgment in Ohno's favor.

## I.  BACKGROUND

### A.  Facts and Procedural History

Ohno, a citizen of Japan, sued the Church in Tokyo District Court. She received a favorable judgment, upheld on appeal to Tokyo's High Court. Ohno then initiated an action for recognition and enforcement of the judgment in the United States District Court for the Central District of California, as Yasuma is a resident of Los Angeles and the Saints of Glory Church ("Saints of Glory") is a registered California religious corporation.

### i.  The Japanese Litigation

The following facts are summarized from the findings of the Tokyo trial court, as set forth in its judgment of August 28, 2009:

Ohno joined Saints of Glory in 1994 while working in London.   Three years later, Ohno began regularly participating in prayer meetings, bible study, and worship at a branch of Saints of Glory in Tokyo.  Part of the Church's program in Tokyo was playing for worshipers there tape recordings of sermons given every Sunday in California by Saints of Glory's principal pastor, Yasuma.  Ohno listened to the tapes while attending church in Tokyo.  Saints of Glory preached obedience to Jesus Christ and to Yasuma.  Members were required to tithe one-tenth of their incomes, which Ohno did.[4]

Ohno was obedient to Yasuma's advice and teachings in various areas of her life.  For example, when Ohno learned that her father was terminally ill, Yasuma "stated something negative about [Ohno] going to see her father," so Ohno did not return home to see him before he died and did not attend his funeral.  Later, after Ohno informed Yasuma that she had lost her job, the Church convinced Ohno to live with another "church member in the same situation," in what we infer from the record was a Church-owned or Church-affiliated residence in Tokyo.  Also, after Yasuma repeatedly made negative statements about medications, Ohno ceased taking the anti-depressants and tranquilizers she had been prescribed when she was diagnosed with depression years earlier.  At Yasuma's instruction, Ohno purchased Saints of Glory videos and books, which she began watching and reading repeatedly. Finally, the Church told Ohno not to purchase her own

---

[4] In the Japanese lawsuit, Ohno did not contest the voluntariness or seek restitution of these routine tithes.  She challenged only the substantial transfers of money that she made to the Church between January and March 2002, referred to in this opinion as "the Transfers."

apartment when she tried to do so, and admonished her for negotiating a reduction in her rent.

Following all these events, and while suffering from both depression and general ataxia (a lack of muscle coordination due to damage to the nervous system), Ohno "became obsessed with a sense of guilt that she had not obeyed Jesus Christ." After Yasuma encouraged Ohno to make "givings" in late 2001, Ohno gave Yasuma and another church minister each 800,000 Yen.[5] Then, on January 2, 2002, Yasuma "took several hours to talk to [Ohno], in a talk referred to as '"Warnings" [or "Reprimands"], pressuring her to tithe'" (alteration in original). After the talk, Ohno felt "overcome with terror and compelled to tithe." Over the span of two months, Ohno closed her savings account and transferred 68,678,424 Yen to Saints of Glory, virtually all of Ohno's assets at that time.

A year after these transfers ("the Transfers"), Ohno was told she would be "driven out" of Saints of Glory because she "had not been obedient to Jesus Christ." The following May, the Church ordered her to leave the apartment where she was living. On the advice of her psychiatrist, Ohno then resumed taking medications for her depression. She also began participating in religious services at a different church.

Ohno eventually came to believe that she had been defrauded by the Church. She filed a complaint in 2007 in Tokyo District Court, asserting tort and unjust enrichment claims against Yasuma, Saints of Glory, and two other individual defendants not parties to the present enforcement action. The dispute centered on the circumstances in which

---

[5] Ohno did not contest or seek restitution of these donations.

Ohno had transferred the approximately $500,000 to Saints of Glory between January and March 2002, leaving her essentially destitute. Ohno contended that the Transfers took place as a result of the Church's "fraudulent and threatening statements" to her while she was in a vulnerable mental and physical state. The Church argued that the contested Transfers were faith-based donations, and that Ohno sought return of the money because she no longer believed in the Church's teachings.

The litigation in Japan lasted over two years and involved several hearings, various filings, and a full merits trial, in which Yasuma and Saints of Glory appeared through counsel. The Tokyo District Court's judgment held Yasuma and Saints of Glory liable under Japanese Civil Code articles 709, 719, and 715, for illegally inducing Ohno to tithe "in such a way as to incite anxiety and cause terror to the Plaintiff who was already in [a] state of depression and was suffering from general ataxia." The Tokyo trial court concluded that Ohno's decision to give the Transfers "under such psychological condition" could not be said to have been made of her own free will, and awarded damages, including restitution of the 68,678,424 Yen Ohno had given to Saints of Glory in the disputed Transfers; 3,000,000 Yen for pain and suffering; and 7,200,000 Yen for attorney's fees. The total award was 78,878,424 Yen ($843,235.66).

As to the grounds for the judgment, article 709 of the Japanese Civil Code, entitled "Damages in Torts," provides: "A person who has intentionally or negligently infringe[d] any right of others, or legally protected interest of others, shall be liable to compensate any damages resulting in consequence." Minpō [Civ. C.] art. 709. Article 719 provides for joint and several liability of joint tortfeasors,

Minpō [Civ. C.] art. 719, and article 715 provides for an employer's liability for the tortious actions of its employees, Minpō [Civ. C.] art. 715. The Japanese trial court did not specify precisely which right or legally protected interest the Church infringed; it stated only that the solicitation of donations from Ohno was illegal because it exceeded "the scope of what is socially appropriate."

Defendants appealed the judgment to the Tokyo High Court, which affirmed the lower court decision on all counts and dismissed the appeal.

### ii. The Enforcement Action in Federal Court

Ohno next brought an international diversity action in the United States District Court for the Central District of California, seeking enforcement of the Japanese judgment against Yasuma and Saints of Glory under California's Uniform Act, Cal. Civ. Proc. Code §§ 1713–1724. In opposition to Ohno's motion for summary judgment, the Church argued that the Religion Clauses bar recovery in tort for the consequences of protected religious speech, including threats of divine retribution, and prohibit a court from judging the validity of the Church's religious teachings. The Japanese judgment, the Church argued, was inconsistent with these principles. The Church further asserted that the Japanese judgment is not entitled to recognition, both because it is "repugnant" to public policy embodied in the Religion Clauses and because it "was obtained through procedures not compatible with the requirements of due process of law." In the alternative, the Church requested that the motion for summary judgment be continued to permit additional discovery relating to the Japanese proceedings.

The district court granted summary judgment in favor of Ohno and entered judgment jointly and severally against Yasuma and Saints of Glory, holding the Japanese judgment not repugnant to the Religion Clauses.[6]  It also denied the Church's request for a continuance under Federal Rule of Civil Procedure 56(f),[7] citing the failure to identify with any specificity the facts sought through additional discovery and why the evidence to be obtained would preclude summary judgment.  This timely appeal followed.

On appeal, the Church contends that the district court was both constitutionally and statutorily required to refuse recognition of the Japanese judgment because the judgment burdens free exercise of religion in violation of the Religion Clauses.  As to the constitutional issue, the Church maintains that enforcement in the United States of a foreign-country judgment that would be violative of the Religion Clauses if issued by a domestic court is itself an exercise of state power, directly subject to constitutional constraints.  Statutorily, the Church argues that a foreign-country judgment that impinges on American constitutional rights is necessarily repugnant to public policy, making its recognition under California's Uniform Act an abuse of discretion.

---

[6] The district court also held that the Japanese judgment was not incompatible with due process of law, but the Church has abandoned its due process arguments on appeal.

[7] Former Rule 56(f) of the Federal Rules of Civil Procedure became Rule 56(d) under the 2010 Amendments to the Federal Rules.  Because the district court decision, the Church's briefs to this court, and the relevant case law in this circuit all refer to the former Rule 56(f), this opinion as well so refers to the rule currently codified as Rule 56(d).

## B. The Uniform Foreign-Country Money Judgments Recognition Act

In international diversity cases such as this one, "enforceability of judgments of courts of other countries is generally governed by the law of the state in which enforcement is sought." *Yahoo! Inc. v. La Ligue Contre le Racisme et L'Antisemitisme*, 433 F.3d 1199, 1212 (9th Cir. 2006) (en banc) (per curiam) ("*Yahoo! II*") (plurality opinion) (citing *Bank of Montreal v. Kough*, 612 F.2d 467, 469–70 (9th Cir. 1980)); *see also id.* at 1239–41 (Fisher, J., concurring in part and dissenting in part). In California, the Uniform Act regulates enforcement of the Japanese damages award at issue here. *See* Cal. Civ. Proc. Code §§ 1713–1724.

The present California foreign judgment enforcement statute was enacted in 2007 to replace the Uniform Foreign Money Judgments Recognition Act, formerly codified at California Civil Procedure Code sections 1713–1713.8, and applies to all recognition and enforcement actions commenced on or after January 1, 2008. *See* § 1724(a); *see also Manco Contracting Co. (W.W.L.) v. Bezdikian*, 45 Cal.4th 192, 204 (2008). California's Act was modeled on the 2005 Uniform Foreign-Country Money Judgments Recognition Act, 13 U.L.A. pt. II, at 18–38 (Supp. 2011), drafted by the National Conference of Commissioners on Uniform State Laws.[8] *See Manco Contracting Co.*, 45 Cal.

---

[8] As of June 2013, nineteen states have enacted the 2005 version of the Uniform Act, or some version thereof, and an additional three states have introduced bills proposing its enactment. *See Foreign-Country Money Judgments Recognition Act*, Uniform Law Commission, The National Conference of Commissioners on Uniform State Laws, http://uniformlaws.org/Act.aspx?title=Foreign-Country Money Judgments Recognition Act (last visited May 25, 2013). The earlier version of the

4th at 198 (describing the background and purpose of the Uniform Act); *Lyustiger v. Lysustiger (In re Marriage of Lyustiger)*, 177 Cal. App. 4th 1367, 1369–70 (2009) (recounting the history of the Act in California).

California's Uniform Act provides that the courts of California "shall recognize a foreign-country judgment" for money damages that is final, conclusive, and enforceable where rendered, except if one or more of the mandatory grounds for non-recognition enumerated in § 1716(b), or discretionary grounds for non-recognition enumerated in § 1716(c), applies.[9]  § 1716(a).  The only exception at issue

---

Uniform Act, approved in 1962, was adopted by twenty-nine states plus the District of Columbia and the Virgin Islands.  *See* Cedric C. Chao & Christine S. Neuhoff, *Enforcement and Recognition of Foreign Judgments in United States Courts: A Practical Perspective*, 29 Pepp. L. Rev. 147, 150 (2001).  The state law versions of the Uniform Act do not vary substantially from state to state.  The more significant distinction lies between those states that have adopted some version of the Uniform Act and those that follow a common law standard stemming from the Supreme Court's decision in *Hilton v. Guyot*, 159 U.S. 113 (1895).  *See* Chao & Neuhoff, 29 Pepp. L. Rev. at 148.

[9] Section 1716(b) provides in full:

> A court of this state shall not recognize a foreign-country judgment if any of the following apply: (1) The judgment was rendered under a judicial system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law. (2) The foreign court did not have personal jurisdiction over the defendant. (3) The foreign court did not have jurisdiction over the subject matter.

Cal. Civ. Proc. Code § 1716(b).

in this appeal is § 1716(c)(3), which provides that a court is "not required to recognize a foreign-country judgment if . . . [t]he judgment or the cause of action or claim for relief on which the judgment is based is repugnant to the public policy of [California] or of the United States." § 1716(c)(3).

Under the Uniform Act, the party seeking enforcement of a foreign judgment bears the initial burden of establishing that the judgment falls within the scope of the Act. § 1715(c). The parties here do not dispute that the Japanese judgment conforms to the threshold requirements for recognition: it grants recovery of a sum of money, as required by § 1715(a)(1); it is final, conclusive and enforceable in Japan, under § 1715(a)(2); and it is not a judgment for taxes, a fine or other penalty, or a judgment in connection with domestic relations, barred from recognition under § 1715(b).

Once coverage under the Uniform Act is established, the presumption in favor of enforcement applies, and the party resisting recognition of a foreign-country judgment "has the burden of establishing that a ground for nonrecognition stated in subdivision [§ 1716](b) or (c) exists." § 1716(d); *see also*

---

Section 1716(c) provides that a court is "not required to recognize a foreign-country [money] judgment if" any of the following nine discretionary grounds for non-recognition exists: (1) lack of notice to the defendant; (2) fraud; (3) repugnancy of the foreign judgment or cause of action to public policy; (4) conflict with another final and conclusive judgment; (5) contrariness to an agreement between the parties regarding the resolution of disputes; (6) inconvenience of the foreign forum; (7) doubts about the integrity of the rendering court; (8) incompatibility of the judgment with the requirements of due process of law; and (9) a recovery under defamation law that provides less protection for freedom of speech and the press than is provided under the U.S. and California Constitutions. *Id*.

Uniform Foreign-Country Money Judgments Recognition
Act, 13 U.L.A. pt. II, at 19 (Supp. 2011) (Prefatory Note).
The repugnancy ground for non-recognition of foreign
judgments is therefore an affirmative defense. *See* § 1716(d).
This statutorily specified burden applies equally where, as
here, the ground of repugnancy is an asserted violation of
federal constitutional norms.  *See, e.g.*, *Sarl Louis Feraud
Int'l v. Viewfinder, Inc*., 489 F.3d 474, 477–78 (2d Cir. 2007).
Thus, the Church has the burden of establishing the grounds
it has raised for non-recognition of the judgment.

## II. DISCUSSION

This case presents questions of first impression in this
circuit, relating to the enforcement of a foreign-country
money judgment challenged on constitutional grounds.[10]
Specifically, we must consider the constitutional implications
of enforcing such a judgment if the Religion Clauses would
bar a court in the United States from rendering the same
judgment in the first instance.  Also at issue is whether a
foreign-country money judgment that might be inconsistent

---

[10] The only Ninth Circuit case that involved somewhat similar issues
concerned a declaratory judgment action seeking to bar enforcement of a
French *injunction*—not a money judgment—requiring an American
company, Yahoo!, to restrict French users' access to certain online
material on the basis of its content. *Yahoo! II*, 433 F.3d 1199.  The district
court had held that enforcement of the order would violate the First
Amendment. *Yahoo!, Inc. v. La Ligue Contre Le Racisme et
L'Antisemitisme*, 169 F. Supp. 2d 1181, 1192–93 (N.D. Cal. 2001)
("*Yahoo! I*"), *rev'd en banc on other grounds*, 433 F.3d 1199 (9th Cir.
2006) (per curiam).  Unlike here, however, no attempt had been made to
enforce the French judgment in the United States.  On appeal, a majority
of the en banc panel agreed that the case should be dismissed, for lack of
ripeness or lack of personal jurisdiction, and so did not reach the merits of
any constitutional or repugnancy questions. *Yahoo! II*, 433 F.3d at 1224.

with the Federal Constitution or a state constitution if issued by a domestic court is repugnant to public policy and therefore can be denied enforcement under the Uniform Act.[11]

As we explain below, we do not reach the question of whether a domestic tort judgment parallel to the Japanese judgment would have been unconstitutional under the Religion Clauses had Ohno's suit been brought here. Instead, we conclude: first, that enforcement of this foreign-country money judgment by a domestic court does not constitute domestic state action triggering constitutional scrutiny; and, second, that neither the judgment at issue in this particular case nor the cause of action on which it is based is so repugnant to public policy as to qualify for non-enforcement under the Uniform Act.

## A.  Constitutional Challenge

The Church's direct constitutional challenge turns on whether the district court's enforcement of the damages award issued by a foreign sovereign amounted to domestic governmental action subject to the constraints of the Religion Clauses.[12]

---

[11] Under the Uniform Act, § 1716(c), a court that determines a foreign-country money judgment or the cause of action on which the judgment is based to be repugnant to public policy is "not required" to recognize the judgment, but—impliedly—may do so at its discretion. Conversely, if the Japanese judgment is not repugnant to public policy, then, barring any other ground for non-recognition, the district court was *required* to enforce it.

[12] The free speech provisions in Article I of the California Constitution do not always turn on state action. *See Ralphs Grocery Co. v. United Food & Commercial Workers Union Local 8*, 55 Cal. 4th 1083, 1093–94

*Recognizing and enforcing* a foreign-country money judgment is distinct from *rendering* that judgment in the first instance. The district court, in giving effect to the judgment issued in Japan, has not participated in the action the Church claims is unconstitutional—namely, judging the truth or falsity of the Church's religious teachings or imposing liability for the consequences of religious expression. In the absence of such participation, we conclude the district court's recognition and enforcement of the Japanese damages award in this case does not transform the underlying foreign court's ruling into domestic "state action" subject to constitutional scrutiny.

### i.   State Action

"[M]ost rights secured by the Constitution are protected only against infringement by governments," so that "the conduct allegedly causing the deprivation of a federal right [must] be fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936–37 (1982) (internal quotation marks omitted). If the action challenged here is not

---

(2012); *Fashion Valley Mall, LLC v. NLRB*, 42 Cal. 4th 850, 858, 870 (2007); *Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 910 (1979), *aff'd*, 447 U.S. 74 (1980). Like the First Amendment Free Exercise Clause, however, the free exercise clause in Article I, section 4 of the California Constitution protects against only governmental action that burdens religious freedom. *See Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 561 (2004); *Vernon v. City of Los Angeles*, 27 F.3d 1385, 1392–93 (9th Cir. 1994). Our discussion therefore applies to both the Federal and State Constitutions. We concentrate on federal state action precedents but do so with the understanding that the same state action principles apply under the California Constitution as well. As we conclude that there was no state action subject to constitutional scrutiny, we need not decide whether the California and federal free exercise clauses are otherwise coterminous.

so attributable, then there is no "state action" and no violation of the Religion Clauses.

Foreign governments, like the government of Japan, are not bound by the U.S. or California Constitutions. "[O]ur notions of due process," for example, do not apply "to foreign court proceedings against American citizens who have committed foreign crimes outside the United States." *United States v. Gecas*, 120 F.3d 1419, 1430 (11th Cir. 1997) (en banc) (citing *Neely v. Henkel*, 180 U.S. 109, 123 (1901)); *see also United States v. Ant*, 882 F.2d 1389, 1395 n.8 (9th Cir. 1989) ("'Neither the Fourth nor the Fourteenth Amendments are directed at Mexican officials . . . .'") (quoting *Brulay v. United States*, 383 F.2d 345, 348 (9th Cir. 1967)); *United States v. Peterson*, 812 F.2d 486, 490 (9th Cir. 1987); *United States v. Rose*, 570 F.2d 1358, 1361–62 (9th Cir. 1978); *Flynn v. Shultz*, 748 F.2d 1186, 1197 (7th Cir. 1984) ("Obviously, the Mexican government is not bound by the requirements of our Constitution even when prosecuting a United States citizen . . . ."). In particular, "[i]t is, of course, a commonplace that the [First Amendment] is a guarantee only against abridgment by government, *federal or state.*" *Hudgens v. NLRB*, 424 U.S. 507, 513 (1976) (emphasis added).

As foreign-country court orders, like domestic contracts between private parties, are not, without more, subject to the constraints of our constitutional law, neither the laws of Japan nor the decisions of its courts constitute domestic "state action" for the purposes of a constitutional claim in this country. The success of the Church's direct constitutional arguments therefore depends upon showing that, through its enforcement by a domestic court, the judgment issued in

Japan becomes action of the government, and so subject to constitutional scrutiny.

Decisions of a domestic court in the United States do constitute governmental action.    State action "refers to exertions of state power *in all forms*," *Shelley v. Kraemer*, 334 U.S. 1, 20 (1948) (emphasis added), so that "[s]tate action, for purposes of the [Constitution], may emanate from rulings of administrative and regulatory agencies as well as from legislative *or judicial action*," *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 179 (1972) (emphasis added).  Thus, "the action of state courts and of judicial officers in their official capacities [has long been] regarded as action of the State within the meaning of the Fourteenth Amendment," *Shelley*, 334 U.S. at 14, and so, too, has the action of federal courts, *see Gathright v. City of Portland*, 439 F.3d 573, 576 n.2 (9th Cir. 2006); *cf. Hurd v. Hodge*, 334 U.S. 24, 31–36 (1948).

So there is no doubt that the district court's decision in this case applying California's Uniform Act—legislation that is itself the result of governmental action—constitutes state action for purposes of constitutional scrutiny.  But that truism does not resolve our question, which is: Should the *substance* of the underlying Japanese monetary damages judgment, resulting from a lawsuit in Japan between two private parties, be ascribed to the district court's enforcement of the judgment under the Uniform Act and so subjected to constitutional scrutiny?    "Precisely when . . . judicial involvement in private litigation assumes constitutional dimensions is a problem that has perplexed courts and scholars for decades." *Dahl v. Akin*, 630 F.2d 277, 280 (5th Cir. 1980).  Given the parallelism, for constitutional state action purposes, between private domestic action and the actions of foreign governments, essentially the same

perplexities arise with regard to the enforcement of foreign judgments resulting from litigation abroad. We therefore rely on both contexts in our analysis.

**a.**

We begin our analysis with general state action precepts: At bottom, the state action requirement serves to "avoid[] imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed." *Lugar*, 457 U.S. at 936. Consistent with this approach, "constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

*Lugar*, a case concerning a private creditor's use of state courts to effectuate a prejudgment attachment, set forth a broadly applicable two-prong framework for analyzing when governmental involvement in private action is itself sufficient in character and impact that the government fairly can be viewed as responsible for the harm of which the plaintiff complains. 457 U.S. at 937–42. The first prong asks whether the claimed constitutional deprivation resulted from "the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Id.* at 937. The second prong determines whether the party charged with the deprivation could be described in all fairness as a state actor. *Id.* Domestic judicial enforcement of the Japanese judgment in this case satisfies neither prong of the *Lugar* framework.

As to the first prong, the Church does not challenge the constitutionality of the Uniform Act, facially or as applied.

Instead, it challenges the constitutionality of the Japanese tort judgment Ohno seeks to enforce under the Uniform Act.  As the source of the alleged constitutional harm is thus Japanese tort law, created by and enforced through Japanese governmental entities, the claimed constitutional deprivation cannot be traced to a right, privilege, or rule of conduct imposed by a domestic governmental entity or individual. *See id.*

The Church disagrees, relying on *Paul v. Watchtower Bible & Tract Society of New York, Inc.*, 819 F.2d 875 (9th Cir. 1987).  *Paul* held that the application of Washington tort law to establish damages liability for actions taken in furtherance of religious beliefs constitutes an exercise of state power, subject to constitutional scrutiny.  *Id.* at 880–81.  The Church's reliance on *Paul* is misplaced.

First, the district court here did not apply tort law; it applied California's Uniform Act, and did not re-try the facts of the case or re-assess the Church's liability for any injury alleged.  Second, even if it could be said that the district court's recognition of the Japanese damages award is tantamount to directly imposing liability in the first instance—a proposition that we do not endorse—the tort law applied in this case is the law of Japan, not of California.  As such, the *content* of the law is not attributable to a domestic state actor, and so its application to the Church's challenged conduct (all of which was conduct that took place in Japan or was specifically directed at Ohno in Japan) is not an exercise of domestic state power.  The same logic applies to private tort suits initiated in the United States: A tort action between private parties does not involve state action simply because the court in which the case is pursued is an organ of the state or federal government.  Rather, a private tort action initiated

in the United States may involve governmental action subject to constitutional constraints where it is domestic substantive law that allows recovery. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 277–78 (1964).

*Paul* applied an analysis similar to that in *New York Times*, explaining that it was because tort liability stemmed from *state substantive law* that its imposition constituted state action triggering constitutional scrutiny. *Paul*, 819 F.2d at 880. Expounding in *Paul*, we clarified that regardless of the form an American state's tort law takes—"whether statutory or common law"—it relies on the power of state government to regulate conduct. *Id.* (citing *New York Times*, 376 U.S. at 265). It is for that reason—and not simply because of judicial involvement—that "the application of [domestic] tort law to activities of a church or its adherents in their furtherance of their religious belief is an exercise of state power." *Id.* Similarly, *Cohen v. Cowles Media Co.* held that a state court's application of the common law doctrine of promissory estoppel to enforce a newspaper's confidentiality agreement was subject to constitutional scrutiny, as an "application of state rules of law." 501 U.S. 663, 668 (1991).

In short, only the tort law of Japan, and not the law of any state or the federal government, underlay the Japanese judgment. The first *Lugar* prong therefore does not apply.

Even if enforcement of the Japanese judgment satisfied the first prong of the *Lugar* framework, it would fail the second. Here, "the party charged with the deprivation" is not "a person who may fairly be said to be a state actor," where "state actor" means an actor for whom a domestic governmental entity is in some sense responsible. *Lugar*, 457 U.S. at 937. Although the Japanese courts are organs of the

State of Japan, they are not organs of the federal or California government. And while the Japanese courts surely perform a public function in Japan, they were not compelled to conclude as they did by American law, or aided in their decision by the participation of an American governmental actor or entity.

Nor can Ohno, in bringing an enforcement suit under California's Uniform Act, be likened to a state actor. "'The Supreme Court has articulated four tests for determining whether a [non-governmental person's] actions amount to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test.'" *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1140 (9th Cir. 2012) (quoting *Franklin v. Fox*, 312 F.3d 423, 444–45 (9th Cir. 2002)). Most relevant here are the "public function" and "joint action" tests[13]: The former treats private

---

[13] These two tests largely subsume the state compulsion and governmental nexus tests, because they address the degree to which the state is intertwined with the private actor or action. The state compulsion test requires a showing that "the state has 'exercised coercive power or has provided such significant encouragement, either overt or covert, that the [private actor's] choice must in law be deemed to be that of the State.'" *Johnson v. Knowles*, 113 F.3d 1114, 1119 (9th Cir. 1997) (alteration in original) (quoting *Yaretsky*, 457 U.S. at 1004). "Under the governmental nexus test, a private party acts under color of state law if 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" *Lopez v. Dep't of Health Servs.*, 939 F.2d 881, 883 (9th Cir. 1991) (per curiam) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). For simplicity, we refer only to the "public function" and "joint action" tests, but intend thereby to incorporate all four tests. Accordingly, our conclusion that Ohno is not a state actor for constitutional purposes encompasses all four state action tests articulated by the Supreme Court.

actors as state actors when they perform a task or exercise powers traditionally reserved to the government. *See, e.g.*, *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974); *Terry v. Adams*, 345 U.S. 461, 469–70 (1953); *Marsh v. Alabama*, 326 U.S. 501, 507–08 (1946). The latter focuses on "'whether state officials and private parties have acted in concert in effecting a particular deprivation of constitutional rights.'" *Tsao*, 698 F.3d at 1140 (quoting *Franklin*, 312 F.3d at 445). "Joint action" exists where the government affirms, authorizes, encourages, or facilitates unconstitutional conduct through its involvement with a private party, *see, e.g.*, *Lugar*, 457 U.S. at 941; *Flagg Bros. v. Brooks*, 436 U.S. 149, 157, 164–65 (1978); *Sniadach v. Family Fin. Corp. of Bay View*, 395 U.S. 337 (1969); *Shelley*, 334 U.S. 1, or otherwise has "so far insinuated itself into a position of interdependence with [the non-governmental party] that it must be recognized as a joint participant in the challenged activity," *Tsao*, 698 F.3d at 1140 (internal quotation marks omitted).

Ohno's use of California's Uniform Act as a litigant does not make her a state actor through the public function test. Although the court assuredly performs a public purpose, a private individual seeking a remedy from a court is seeking gain for him or herself, a purely private act. "[M]erely resorting to the courts and being on the winning side of a lawsuit does not make a party a co-conspirator . . . with the judge." *Dennis v. Sparks*, 449 U.S. 24, 28 (1980).

Nor does Ohno's invocation of the Uniform Act convert the underlying Japanese judgment into the joint action of Ohno and the State of California or the district court. Again, although California's Uniform Act creates the legal framework that may entitle the holder of a qualifying foreign-country money judgment to recognition and enforcement of

that judgment in the courts, the Uniform Act is not the source of the substantive legal rights underlying the judgment enforced.

To be sure, the district court's enforcement order facilitates Ohno's efforts to recover in the United States the sum of money awarded by the Japanese court. But the district court, through its implementation of the procedures established by the Uniform Act, cannot be said to provide "significant assistance" to the *underlying* acts that the Church contends constituted the core violation of its First Amendment rights—namely, judicial scrutiny of the content of its religious beliefs and imposition of liability for the consequences of its religious expression. California law *requires* a court to recognize a final, conclusive foreign monetary award that is enforceable where rendered, Cal. Civ. Proc. Code § 1716(a), without inquiry into the merits of the underlying judgment, once the court determines that there is no ground for nonrecognition under § 1716(b) or (c) of the Uniform Act. The court's mandatory indifference to the underlying merits of the judgment Ohno is seeking to enforce refutes any characterization by the Church of Ohno's enforcement effort as a joint action with California or the federal judiciary as to the aspects of the Japanese judgment alleged to compromise the Church's religious freedom.

Notably, the cases in which the Supreme Court has held that private use of state-created procedures amounts to state action have, by and large, concerned due process challenges to the state procedures themselves or their application. Those cases have not addressed constitutional challenges to the underlying causes of action that prompted the non-governmental party's recourse to the state enforcement procedures. *See, e.g.*, *Tulsa Prof'l Collection Servs., Inc. v.*

*Pope*, 485 U.S. 478 (1988); *Lugar*, 457 U.S. 922; *Sniadach*, 395 U.S. 337.[14]   For example, in *Sniadach*, the petitioner challenged the proceedings by which her wages were garnished, arguing that they violated due process.  395 U.S. at 339–40.   She did not contend that the underlying contractual debt could not ultimately be judicially enforced because there was some aspect of the contract that, if mandated by the government, would constitute unconstitutional state action.   *Id.*   Here, in contrast, the Church's challenge is not to the procedures used to enforce the underlying Japanese judgment in federal court but to the substantive rights and defenses that gave rise to that judgment—which, for present purposes, is analogous to a private contract or debt, because not attributable to any domestic state action or state actors.

As to a final joint action consideration, it cannot be said that the federal or California government in any meaningful way accepts benefits derived from the allegedly unconstitutional actions.  *See Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 926 (9th Cir. 2011).  At most, the United States may gain some diplomatic benefit when it recognizes foreign-country judgments, manifested through increased reciprocity in the treatment of U.S. judgments

---

[14] In *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991), the Court came closer than in the run of cases to imputing the substance behind a private party's use of a state procedure—that of peremptory challenges to strike prospective jurors from a venire—to the state itself. But unlike statutory schemes such as the Uniform Act, which exist to serve private purposes, the entire endeavor at issue in *Edmonson* serves *governmental* purposes—namely, conducting a civil trial.   Through peremptory challenges, the state essentially delegates to private parties in a civil trial part of the public function of selecting a jury.  *See id.* at 621–24.

abroad.  But this benefit is, once again, independent of the content of the judgments recognized and so cannot be said to incorporate the allegedly unconstitutional acts underlying them.

In sum, neither the Uniform Act nor the district court's challenged enforcement at Ohno's behest of the Japanese money judgment meets the standards for state action, under the controlling *Lugar* framework, with regard to the substance of the Japanese judicial decision.  Both the Act and the court's involvement in implementing it are assuredly governmental actions.  But the purposely limited nature of that involvement undermines the attribution to domestic governmental actors of responsibility for the Japanese court's determination that the Church committed a tort by unfairly inducing Ohno to transfer all of her money to Saints of Glory, and so is liable to her for damages.

### b.

Consideration of the seminal civil rights case, *Shelley v. Kraemer*, 334 U.S. 1, does not alter our mode of analysis under the generally applicable *Lugar* framework or lead us to conclude otherwise.  *Shelley* established that judicial enforcement of a legal right or obligation whose source is not domestic governmental action *can* constitute state action triggering constitutional scrutiny.  *See id.* at 20.  Specifically, *Shelley* held that a state court's enforcement of racially restrictive housing covenants entered into between private land owners amounts to state action in violation of the Equal Protection Clause.  *Id.*  The Court viewed the interposition of judicial coercive power to enforce racially discriminatory private agreements as governmental discrimination on the basis of race.  *Id.* at 20–21; *see also Barrows v. Jackson*, 346

U.S. 249, 254, 258 (1953) (applying the same state action principle to a court's award of damages for violation of a discriminatory private contract).

But *Shelley* has not been interpreted as meaning that domestic judicial enforcement of *any* monetary obligation necessarily transforms the circumstances that gave rise to that obligation into state action for constitutional purposes.[15]

---

[15] Looking for precedents applying *Shelley* in the context of domestic enforcement of foreign judgments yields few helpful authorities. The *Yahoo!* district court, relying on *Shelley*'s reasoning, refused to enforce a foreign judgment on First Amendment grounds, holding that domestic judicial enforcement of a foreign judgment constitutes state action with regard to the underlying foreign order, for constitutional purposes. *Yahoo! I*, 169 F. Supp. 2d at 1189, *rev'd on other grounds*, *Yahoo! II*, 433 F.3d 1199. *Yahoo! I* concerned a French *injunction* that imposed viewpoint-based restrictions on speech. As we discuss later, *see* Parts II.A.i.c, II.B.ii, the state action considerations with respect to enforcement of a foreign injunction differ from those that arise with respect to enforcement of an order to pay a sum of money.

On appeal, we dismissed the *Yahoo! I* case for lack of personal jurisdiction and ripeness, without mentioning *Shelley* or its reasoning. *Yahoo! II*, 433 F.3d at 1201. To the extent that the opinions discussed the merits of the First Amendment question, a majority of the judges on the en banc panel assumed that the constitutionality of enforcing the challenged foreign judgment would depend on whether compliance with the French court's order would restrict Yahoo!'s dissemination of, and users' access to, speech *in the United States. See id.* at 1220–22 (plurality opinion); *id*. at 1234–35, 1244–45 (Fisher, J., concurring in part and dissenting in part).

Other courts addressing similar issues have held, without discussing state action directly or otherwise explaining their conclusion, that where a foreign judgment fails to comport with domestic constitutional requirements, "the refusal to recognize the judgment should be, and it is deemed to be, 'constitutionally mandatory.'" *Bachchan v. India Abroad*

Instead, *Shelley*'s attribution of state action to judicial enforcement has generally been confined to the context of discrimination claims under the Equal Protection Clause. In the context of First Amendment challenges to speech-restrictive provisions in private agreements or contracts, domestic judicial enforcement of terms that could not be enacted by the government has not ordinarily been considered state action. *See, e.g.*, *Democratic Nat'l Comm. v. Republican Nat'l Comm*., 673 F.3d 192, 204–05 (3d Cir. 2012) ("The Supreme Court has declined to find state action where the court action in question is a far cry from the court enforcement in *Shelley*. . . . Court enforcement of a private agreement to limit a party's ability to speak or associate does not necessarily violate the First Amendment."), *cert. denied*, 133 S. Ct. 931 ( 2013). Various state court decisions "enforce restrictions on speech arising from domestic contracts that could not have been enacted into law due to the First Amendment." Mark D. Rosen, *Exporting the Constitution*, 53 Emory L.J. 171, 174, 192–94 & nn.98–111 (2004) (compiling cases).[16]

---

*Publ'ns Inc.*, 585 N.Y.S.2d 661, 662 (N.Y. Sup. Ct. 1992); *see also Viewfinder*, 489 F.3d at 480 (holding "unenforceable" judgments that "impinge on First Amendment rights") (quoting *Bachchan*, 585 N.Y.S.2d at 662, and *Yahoo! I*, 169 F. Supp. 2d at 1189–90). Although those rulings may assume that judicial enforcement transforms the underlying foreign judgment into one adopted by and attributable to the domestic court, the opinions do not identify the basis for any such unarticulated assumption.

[16] *See, e.g.*, *Golden Gateway Ctr. v. Golden Gateway Tenants Ass'n*, 26 Cal. 4th 1013, 1033–35 (2001) (upholding an injunction enforcing a lease provision prohibiting tenants from distributing unsolicited newspapers on the ground that "judicial enforcement of injunctive relief does not, by itself, constitute state action for purposes of California's free speech clause"); *State v. Noah*, 103 Wash. App. 29, 48–50 (2000) (judicial enforcement of a voluntary settlement agreement prohibiting public

Similarly, in the context of judicial confirmation of arbitral awards, loosely analogous to recognition of foreign-country money judgments, the Eleventh Circuit has held that "mere confirmation of a private arbitration award by a district court is insufficient state action to trigger the application of the Due Process Clause." *Davis v. Prudential Secs., Inc.*, 59 F.3d 1186, 1192 (11th Cir. 1995). Other courts agree. *United States v. American Society of Composers, Authors & Publishers*, 708 F. Supp. 95 (S.D.N.Y. 1989), for example, held that a court's "mere approval . . . of the use of arbitration did not create any state action" lest "all arbitrations . . . be subject to due process limitations through the simple act of appealing the arbitrators' decisions to the court system." *Id.* at 97. And the California Court of Appeal has made clear that "the limited state involvement of converting the [arbitration] award into a judgment . . . [does] not engender the same due process incidents required with respect to an award originally assessed and imposed by a court." *Rifkind*

---

criticism of certain type of psychological therapy was not state action); *Linn Valley Lakes Prop. Owners Ass'n v. Brockway*, 250 Kan. 169, 172–73 (1992) (judicial enforcement of a restrictive covenant barring the posting of signs was not state action); *cf. CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1026 (S.D. Ohio 1997) ("[T]he mere judicial enforcement of . . . trespass laws [of general application] by the private owner of property does not alone render [the owner] a state actor."); *Commonwealth v. Hood*, 389 Mass. 581, 587–89 (1983) (holding that judicial enforcement of trespass statute of general application is not state action); *but see W. Hill Baptist Church v. Abbate*, 261 N.E.2d 196, 200–01 (Ohio 1969) (judicial enforcement of restrictive covenant excluding houses of worship constitutes state action).

*& Sterling, Inc. v. Rifkind*, 28 Cal. App. 4th 1282, 1292 (1994).[17]

Courts' reluctance, since *Shelley*, to expand that case's holding too far beyond its original context stems from a concern for preserving a sphere for private action and private actors, not subject to the constitutional constraints designed to protect our populace from *governmental* control and overreaching. "[I]f, for constitutional purposes, every private right were transformed into governmental action by the mere fact of court enforcement of it, the distinction between private and governmental action would be obliterated." *Edwards v. Habib*, 397 F.2d 687, 691 (D.C. Cir. 1968). Similarly, extending *Shelley*'s holding to judicial enforcement of foreign-country money judgments would effectively require foreign governments desiring American recognition of their judicial rulings to apply the substantive provisions of the U.S. Constitution in their courts whenever there is a defendant who could be sued for enforcement in the United States, regardless of where the conduct subject to adjudication occurred or who the litigants are. Such wholesale imposition of all aspects of our Constitution abroad is inconsistent with the principles of comity and respect for sovereignty underlying the recognition of foreign judgments.

For all these reasons, the district court's enforcement of the Japanese judgment does not render the substantive law applied by the Japanese court, or the judgment it reached in applying that law, domestic state action directly constrained

---

[17] In citing these cases, we do not mean to adopt or sanction any of their specific holdings. Instead, they are illustrative of the principle that *Shelley* has not been understood as applying generally to judicial enforcement of non-governmental agreements or decisions.

by the California or U.S. Constitutions. Consequently, contrary to the Church's contention, non-recognition of the judgment cannot be constitutionally mandatory.

**c.**

In so holding, we do not suggest that "*all* that matters" in the state action inquiry is whether an American entity "is the origin of the legal right" enforced in a domestic court. Rosen, 53 Emory L.J. at 207. For example, there may be circumstances in which the nature of the enforcement action requires the court to take such an active role in, or to exercise sustained supervision of, the underlying legal decision or the resulting allocation of rights that it becomes appropriate to view the court's activities as governmental actions with regard to the substance of the underlying decision or of the resulting order.

Such may well be the case, for example, with regard to the enforcement in a domestic court of some (or all) injunctions issued by foreign countries. Injunctions directly compel or forbid a party's actions, and thus may be seen as placing the domestic court's imprimatur behind the substance of the foreign court's order to that extent. Also, enforcement of injunctions implies the authority to exercise contempt and modification powers after the injunction issues; the exercise of such authority may entangle the enforcing court in the merits of the underlying dispute. Whether or not these aspects of injunctive relief could result in a determination that enforcement by a domestic court of a particular foreign injunction constitutes state action for constitutional purposes, those same considerations are not present where, as here, the enforcement is of an order to pay over a pre-determined amount of money. In the latter instance, the connection

between the narrow domestic court order and the asserted violation by the foreign court of substantive rights protected by our Constitution is simply too attenuated, without more, to attribute responsibility for the merits of the underlying judgment to a domestic state actor. And, standing alone, the order—to pay money to someone—does not mandate a constitutionally protected act.

### ii. Application of the First Amendment to the Church's Conduct

Because the Church's constitutional claim fails at the state action stage, we need not decide directly whether the First Amendment's protections actually do reach the assertedly religious expression at issue in the Japanese suit. As three judges noted in *Yahoo! II*, "[t]he extent of First Amendment protection of speech accessible solely by those outside the United States is a difficult and, to some degree, unresolved issue" and "the extent—indeed the very existence—of such an extraterritorial right under the First Amendment [to publish speech in violation of foreign law] is uncertain." 433 F.3d at 1217, 1221 (plurality opinion). Nor has any court yet decided whether the First Amendment's Free Exercise Clause applies to religious expression initiated domestically but directed to a foreign audience.

Ohno was in Japan at all relevant times, and the Church communicated with her there.[18] Absent demonstrated impact

---

[18] The Japanese court's findings indicate that the Church intentionally directed its allegedly religious speech to Ohno in Japan. The court found, for example, that "[o]n January 2, 2002, . . . Yasuma *took several hours to talk to Ohno* [on January 2, 2002], . . . pressuring her to tithe," (emphasis added) and that this talk ultimately led Ohno to make the

of the Japanese judgment on conduct in the United States, the only constitutional question we face would "involve a determination whether the First Amendment has extraterritorial application"—a determination this Court declined to make in *Yahoo! II*, 433 F.3d at 1217–18, 1222 (plurality opinion); *see also id.* at 1234–35, 1244–45 (Fisher, J., concurring in part and dissenting in part), and which we likewise decline to make here.[19]  Having concluded that the enforcement of the judgment does not amount to state action, we reserve for another day the task of tracing the First Amendment's reach beyond our borders.

Our analysis does not, however, foreclose other, non-constitutional bars to enforcement of a foreign-country money judgment, such as repugnancy to public policy.  As we discuss next, there can be sound policy justifications for refusing to recognize foreign-country money judgments that the Constitution would forbid a domestic court from rendering in the first instance.

---

contested transfers to Saints of Glory.  The findings also show that as a general matter, the Church sent recordings of each of Yasuma's sermons to Japan, to be played to its members there.  The Church does not dispute that the events at issue "occurred chiefly in Japan." Although it is not clear whether Yasuma came to Japan or whether, instead, the Church sent a copy of her speech to Japan, we do not see why it matters which is the case.

[19] That the judgment at issue here is an award of monetary damages rather than an injunction, as in *Yahoo!*, could bear on our analysis of the substantive constitutional issue as well as on the state action inquiry. While the imposition of liability in the form of damages can have the effect of chilling protected conduct, that effect is much less direct than is the effect of using the coercive power of a domestic court to ensure that a defendant complies with the terms of an injunction, compelling or forbidding particular conduct.

## B. Statutory Challenge: Repugnancy to Public Policy

In addition to its constitutional argument, the Church contends that the Japanese judgment is not entitled to recognition and enforcement under California's Uniform Act because it is "repugnant to the public policy" embodied in the Religion Clauses of the Federal and State Constitutions. A foreign judgment that would be unconstitutional if rendered in this country necessarily qualifies as repugnant, the Church maintains, making its recognition an abuse of discretion under California's Uniform Act.

The Act permits—but does not require—courts to deny recognition to foreign monetary awards if either "[t]he *judgment* or the *cause of action or claim for relief* on which the judgment is based is repugnant to the public policy of California or of the United States." § 1716(c)(3) (emphases added). Accordingly, we examine whether either the Japanese law on which the judgment rests or the judgment issued meets the stringent standard for repugnancy under California law.

### i. The Standard of Review

We first address the proper standard for reviewing a district court's decision whether to refuse recognition of a foreign-country money judgment under California's Uniform Act or similar state statutes on grounds of repugnancy to public policy. The only case of this court addressing a somewhat similar issue is *Arab Monetary Fund v. Hashim (In re Hashim)*, 213 F.3d 1169 (9th Cir. 2000). *Hashim* treated a bankruptcy court's determination that an English award of costs and fees was "repugnant to American jurisprudence" and thus unenforceable under Arizona common law

principles of comity, as a legal conclusion, subject to *de novo* review.  *Id.* at 1172.[20]

Absent a demonstrated ground for non-recognition, enforcement of a qualifying foreign-country money judgment is mandatory under California's Uniform Act.  § 1716(a). Here, the district court's decision to recognize and enforce the Japanese court's judgment, over the Church's objections, hinged on a preliminary determination that neither the judgment nor the underlying cause of action was fundamentally incompatible with, and therefore repugnant to, the Religion Clauses.  Because that determination was a conclusion of law, we, as in *Hashim*, examine *de novo* the district court's legal evaluation.  Given that the Church has asserted no other ground for non-recognition on appeal, if the district court correctly determined that neither the Japanese judgment nor the underlying cause of action is repugnant to

---

[20] Other circuits reviewing recognition of foreign judgments under state statutes similar to California's have applied an abuse of discretion standard.  *See, e.g.*, *Banque Libanaise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1004–06 (5th Cir. 1990) (reviewing for abuse of discretion a district court decision whether to apply a non-mandatory ground of non-recognition under Texas's Uniform Act); *Ingersoll Milling Mach. Co. v. Granger*, 833 F.2d 680, 688 (7th Cir. 1987) (reviewing for abuse of discretion the district court's refusal to deny recognition on public policy grounds under Illinois's Uniform Act, but evaluating the defendant's principal legal arguments de novo "for the sake of completeness"); *cf. Remington Rand Corp.-Del. v. Bus. Sys. Inc.*, 830 F.2d 1260, 1266 (3d Cir. 1987) (citing *IIT Corp. v. Lam (In re Colo. Corp.)*, 531 F.2d 463, 469 (10th Cir. 1976) (reviewing for abuse of discretion the extension or denial of comity)).  Even if we were to apply a deferential standard of review, a district court "abuses its discretion when it commits an error of law."  *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 636 (9th Cir. 2012). So the analysis would be the same as the one we conduct.

public policy, then recognition of the damages award was statutorily required.

## ii. The Standard for Repugnance

California courts have set a high bar for repugnancy under the Uniform Act. The standard, rooted in the public policy exception to the comity doctrine at common law, *see Hilton v. Guyot*, 159 U.S. 113, 205–06, 227–28 (1895), measures not simply whether the foreign judgment or cause of action is contrary to our public policy, but whether either is "*so* offensive to our public policy as to be 'prejudicial to recognized standards of morality and to the general interests of the citizens.'" *Java Oil Ltd. v. Sullivan*, 168 Cal. App. 4th 1178, 1189–92 (2008) (emphasis added) (quoting *Wong v. Tenneco, Inc.*, 39 Cal. 3d 126, 135–36 (1985)). Thus, "even where it is agreed that a foreign law offends public policy, it may still be applied in a limited context where the potential harm is minimal." *Wong*, 39 Cal. 3d at 136. Put another way, the public policy exception codified at § 1716(c)(3) does not apply unless a foreign-country judgment or the law on which it is based is "so antagonistic to California [or federal] public policy interests as to preclude the extension of comity." *Crockford's Club Ltd. v. Si–Ahmed*, 203 Cal. App. 3d 1402, 1406 (1988) (internal quotation marks omitted).[21]

---

[21] The revised Uniform Foreign-Country Money Judgment Act of 2005, on which the California statute is based, retained "the stringent test for finding a public policy violation applied by courts interpreting the [previous version of the] Act." Uniform Foreign-Country Money Judgments Recognition Act, 13 U.L.A. pt. II, § 4, cmt. 8, at 28 (Supp. 2011). According to that test, the commentary to the model Uniform Act explains, "[p]ublic policy is violated only if recognition or enforcement of the foreign country judgment would tend clearly to injure public health, the public morals, or the public confidence in the administration of law,

In the context of an Arizona enforcement action, construing common law principles of international comity similar to those on which California's Uniform Act is based, *see Manco Contracting Co.*, 45 Cal. 4th at 198, we observed that "few judgments fall in the category of judgments that need not be recognized because they violate the public policy of the forum," *In re Hashim*, 213 F.3d at 1172 (internal quotation marks omitted). "It has long been the law that unless a foreign country's judgments are the result of outrageous departures from our own motions of 'civilized jurisprudence,' comity should not be refused." *British*

---

or would undermine that sense of security for individual rights, whether of personal liberty or of private property, which any citizen ought to feel." *Id.* (internal quotation marks omitted); *see also* Restatement (Third) of Foreign Relations Law of the United States § 482 cmt. f (1987); Restatement (Second) of Conflict of Laws § 117 (1971).

Our sister circuits have applied a similarly strict standard to the repugnancy exception of other states' foreign judgment enforcement statutes. *See Viewfinder*, 489 F.3d at 479–80 ("The public policy inquiry rarely results in refusal to enforce a judgment unless it is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense." (internal quotation marks omitted)); *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986) (describing the repugnancy standard as "high, and infrequently met," applying only in "clear-cut" cases where the judgment or cause of action on which it is based is contrary to "'fundamental notions of what is decent and just'" (quoting *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981))); *Sw. Livestock & Trucking Co. v. Ramon*, 169 F.3d 317, 321 (5th Cir. 1999) (noting that the "level of contravention of Texas law" has to be "high" for the court to deny recognition on public policy grounds); *cf. Andes v. Versant Corp.*, 878 F.2d 147, 150 (4th Cir. 1989) (holding, without expressly discussing repugnancy to public policy, that a court applying Maryland's Uniform Foreign-Money Judgments Act would not give effect to an English rule of preclusion that is "so much at odds with normal American notions of litigation that no American jurisdiction would readily embrace it").

*Midland Airways Ltd. v. Int'l Travel, Inc.*, 497 F.2d 869, 871
(9th Cir. 1974) (quoting *Hilton*, 159 U.S. at 205).

   Simple inconsistency between American state or federal
law and foreign law, then, does not render a foreign judgment
unenforceable by reason of repugnancy.  *See Yahoo! II*, 433
F.3d at 1215 (plurality opinion).  Foreign judgments are not
to be "tried afresh" in U.S. courts, applying domestic
concepts.  *See Hilton*, 159 U.S. at 202–03.  "We are not so
provincial as to say that every solution of a problem is wrong
because we deal with it otherwise at home."  *Loucks ex rel.
Loucks  v. Standard Oil Co. of N.Y.*, 224 N.Y. 99, 111 (1918)
(Cardozo, J.).

   Applying these principles, courts in other jurisdictions
have declined to enforce foreign-country money judgments
on grounds of repugnance to the public policy embodied in
the First Amendment, but only where there were stark
differences between foreign and domestic law.  In *Telnikoff
v. Matusevitch*, 347 Md. 561 (1997), for example, Maryland's
high court declined to enforce an English libel judgment
under principles of comity because English defamation law
"is totally different" from Maryland defamation law "in
virtually every significant respect" and "so contrary . . . to the
policy of freedom of the press underlying Maryland law."  *Id.*
at 598–99.  A New York trial court similarly refused
recognition of an English libel judgment on the ground that
English libel standards are "*antithetical* to the protections
afforded the press by the U.S. Constitution," explaining that
the presumptions and burdens of proof under English libel
law are the reverse of those under American law, requiring
media defendants to prove the truth of speech of public
concern, rather obliging plaintiffs to demonstrate falsity.

*Bachchan v. India Abroad Publ'ns Inc.*, 585 N.Y.S.2d 661, 665 (1992) (emphasis added).[22]

In *Yahoo! I*, the Northern District of California, in an opinion reversed on jurisdictional grounds, *see Yahoo! II*, 433 F.3d 1199, applied similar logic to that in *Telnikoff* and *Bachchan* and barred enforcement of a French injunction requiring the Internet company Yahoo! to block French users' access to Nazi-related website content. *See Yahoo! I*, 169 F. Supp. 2d at 1184–85. The "content and viewpoint-based regulation" of Internet speech, the district court held, "clearly would be inconsistent with the First Amendment if mandated by a court in the United States." *Id.* at 1192–93.

---

[22] Federal law now controls domestic actions seeking recognition of foreign defamation judgments. In August 2010, Congress adopted the SPEECH Act ("Securing the Protection of our Enduring and Established Constitutional Heritage Act."), Pub. L. No. 111-223, 124 Stat. 2380 (2010), 28 U.S.C. §§ 4101–4105, effectively codifying the approach adopted in *Telnikoff*. The Act was prompted by a perceived increase in the frequency of foreign libel judgments inconsistent with the First Amendment, Pub. L. No. 111-223, § 2(5), and concern that these suits were "significantly chilling American free speech and restricting both domestic and worldwide access to important information." S. Rep. No. 111-224, at 2 (2010); *see also* Pub. L. No. 111-223, § 2(3). The new law makes foreign defamation judgments unenforceable in the United States unless it can be shown that such judgments satisfy the protections of freedom of speech and press guaranteed by both the First Amendment to the United States Constitution and the constitution of the state in which the domestic court is located. *See* 28 U.S.C. § 4102(a)(1). Notably, the SPEECH Act does not pertain to all foreign judgments allegedly inconsistent with any part of the First Amendment but focuses uniquely on defamation actions and the "First Amendment rights of American authors and publishers." H.R. Rep. No. 111-154, at 5 (2009), *reprinted in* 2010 U.S.C.C.A.N. 812, 816. California's Uniform Act contains a similar special exception for foreign judgments rendered in defamation actions. *See* Cal. Civ. Proc. Code § 1717(c).

These cases do not suggest that a looser standard applies when the asserted repugnancy arises from an inconsistency with U.S. constitutional as opposed to statutory or common law principles. There is no California case so holding and no basis in the statutory language for such a conclusion. Rather, the cases underscore that only judgments presenting a direct and definite conflict with fundamental American constitutional principles will be denied recognition because repugnant.

Such direct conflict is more apt to arise where the foreign-country judgment—or the law underlying it—does not incidentally or indirectly affect conduct that may be protected in the United States, but expressly targets such conduct. *Telnikoff*, *Bachchan*, and *Yahoo!* (*I & II*), all concerned challenges to enforcement of foreign-country judgments issued on the basis of foreign laws specific to speech or expression—such as libel, defamation and hate speech laws—not laws of general application, such as the Japanese tort laws underlying the judgment at issue here.[23] The state courts in *Telnikoff* and *Bachchan*, and the district court in *Yahoo! I*, found repugnancy *not* based on the way that a particular foreign law was applied to the specific facts of the

---

[23] The same distinction may be drawn between the present case and another circuit court opinion, involving enforcement of a French intellectual property and copyright judgment, targeting the publication of photographs. *See Viewfinder*, 489 F.3d 474. The district court had held the French judgment repugnant to public policy on the grounds that it was fundamentally at odds with principles of free expression protected by the U.S. and New York Constitutions. *Sarl Louis Feraud Int'l v. Viewfinder Inc.*, 406 F. Supp. 2d 274, 285 (S.D.N.Y. 2005). The Second Circuit vacated and remanded for a more thorough comparison of French and U.S. copyright law and the "fair use" exception for First Amendment-protected activity. 489 F.3d at 484.

case, but because of fundamental differences in the guiding legal doctrine applied or the procedures used in the foreign-country court as compared to domestic legal principles. The courts concluded that the foreign judgments in question were repugnant to public policy because they would *unquestionably* violate the Constitution were they issued here with respect to domestic activity; those conclusions were not fact-dependent. In other words, it was not debatable whether the orders, if domestically issued and applied, could have survived constitutional scrutiny.

The situation with which we are faced here is quite otherwise. As will appear, it is highly debatable, at least, whether tort liability could be imposed on the Church for inducing Ohno's Transfers, and the ultimate determination of that question would be highly fact-dependent. As the Japanese cause of action and judgment in this case are not *antithetical* to the Religion Clauses, they are not repugnant to California or U.S. public policy in the sense required by the exception in California's Uniform Act.

### iii.  Repugnancy of the Japanese Cause of Action and Claims

In evaluating the repugnancy of a foreign cause of action, we compare the legal basis for liability and the plaintiff's claims for relief in the foreign court with comparable grounds for suit in the United States. If American law recognizes generally parallel causes of action, the foreign cause of action cannot be said to be repugnant to American public policy.[24]

---

[24] This condition is sufficient but not necessary for non-repugnancy. There could be foreign causes of action that have no parallel in domestic law but are not repugnant to any aspect of domestic law either.

This assessment does not depend on whether the standards for evaluating a cause of action or the elements required to state a claim are *identical* under domestic and foreign law.    Instead, we necessarily focus on the *fundamentals* of the cause of action underlying the foreign judgment and defenses thereto, "not the differences in the bodies of law" or in the way in which remedies are afforded. *Soc'y of Lloyd's v. Reinhart*, 402 F.3d 982, 995 (10th Cir. 2005); *see also Soc'y of Lloyd's v. Turner*, 303 F.3d 325, 332 (5th Cir. 2002).    That a particular cause of action does not exist, or that a particular claim would not be cognizable, in California does not obligate us to refuse enforcement of a judgment, as long as the existence of the cause of action is not itself repugnant to California public policy.    *See* Restatement (Third) of Foreign Relations Law of the United States § 482 cmt. f (1987);  Restatement (Second) of Conflict of Laws § 117 (1971).

Here, the Church was held liable under article 709 of the Japanese Civil Code, which provides that "[a] person who has intentionally or negligently infringe[d] any right of others, or legally protected interest of others, shall be liable to compensate any damages resulting in consequence." Minpō [Civ. C.] art. 709 (Japan).    There is nothing repugnant to California public policy about providing a damages remedy for intentional or negligent injury to others' rights or protected interests.    California tort law—and American tort law generally—does exactly that. *See, e.g.*, Cal. Civ. Code § 1714.    And, while a party's status as a religious entity or believer may bear on certain relevant inquiries, such as whether the party may assert a Religion Clause defense, that does not render the party *immune* from liability under tort law. *Cf. Viewfinder*, 489 F.3d at 480–81 (explaining that an entity's status as a news publication may bear on its assertion

of a "fair use" defense but does not entitle it to immunity from liability under intellectual property laws). Accordingly, the general availability of a tort remedy in Japan for a suit against a church is not, on its face, repugnant to California public policy.

We look next at the particular claims on which the tort cause of action was based. Ohno's claims are analogous to actions for undue influence, fraud, negligent or intentional infliction of emotional distress, and unjust enrichment under California law. *See* Cal. Civ. Code §§ 1572 (fraud), 1575 (undue influence); 1714 (liability for willful or negligent injury to others).[25] The Church maintains that claims of undue influence, fraud, negligent or intentional infliction of emotion distress, or unjust enrichment are not cognizable in California if the defendants' actions giving rise to liability were facially religiously motivated. At the level of generality at which this assertion is made, it is false.

American courts can recognize tort liability for acts assertedly motivated by religion. The Religion Clauses do not bar tort claims against a religious entity or its members, so long as adjudicating the cause of action does not require a

---

[25] The Supreme Court of California and California Courts of Appeal have recognized actions for relief under the equitable doctrine of unjust enrichment. *See Ghirardo v. Antonioli*, 14 Cal. 4th 39 (1996) (recognizing a cause of action for unjust enrichment upon a showing that the defendant received benefit through another's known mistake, fraud, coercion or other tortious conduct); *see also Hernandez v. Lopez*, 180 Cal. App. 4th 932, 938 (2009) ("The doctrine applies where plaintiffs, while having no enforceable contract, nonetheless have conferred a benefit on defendant which defendant has knowingly accepted under circumstances that make it inequitable for the defendant to retain the benefit without paying for its value.").

court to judge the validity of religious beliefs or interfere with ecclesiastical decisionmaking regarding self-governance or employment. *See, e.g.*, *United States v. Ballard*, 322 U.S. 78, 86 (1944); *Molko v. Holy Spirit Ass'n for Unification of World Christianity*, 46 Cal. 3d 1092, 1115–16 (1988); *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 956, 959–62 (9th Cir. 2004) (citing *Bollard v. Cal. Province of Soc'y of Jesus*, 196 F.3d 940, 945–47 (9th Cir. 1999)).

The Religion Clause protections "embrace[] two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940); *see also Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1128 (9th Cir. 2009); *Molko*, 46 Cal. 3d at 1112. Conduct, including speech-based conduct such as solicitation, "remains subject to regulation for the protection of society." *Cantwell*, 310 U.S. at 304. So recognizing, California courts have entertained claims of fraud, undue influence, and intentional infliction of emotional distress brought against religious entities by former members seeking recovery of donations and damages for harm. *See, e.g.*, *Molko*, 46 Cal. 3d 1092; *Wollersheim v. Church of Scientology of Cal.*, 212 Cal. App. 3d 872 (1989) ("*Wollersheim I*"), *vacated and remanded on other grounds*, 499 U.S. 914 (1991), *amended by* 6 Cal. Rptr. 2d 532 (Ct. App. 1992) ("*Wollersheim II*").[26] Religiously

---

[26] The Supreme Court vacated and remanded *Wollersheim I* for reconsideration of the punitive damages award in light of *Pacific Mutual Life Insurance Company v. Haslip*, 499 U.S. 1 (1991). *See Wollersheim*, 499 U.S. 914 (1991). On remand, *Wollersheim II* "incorporated intact and unaltered" the portion of *Wollersheim I* that "dealt exhaustively with the tort [and] freedom of religion" issues. *Wollersheim II*, 6 Cal. Rptr. 2d at 534 n.1. The California Supreme Court subsequently granted review of *Wollersheim II*, *see* 10 Cal. Rptr. 182 (1992), but, "following the

motivated gifts have been set aside on a strong showing of undue influence by religious advisors over the testamentary act. *See Sunland Home Found., Inc. v. Bourquin (In re Estate of Bourquin)*, 161 Cal. App. 2d 289, 299–300 (1958).

With respect to speech related to solicitation for a religious cause, there is no *categorical* bar under domestic law to a claim in tort. The state is "free to regulate the time and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience." *Cantwell*, 310 U.S. at 306–07. The preservation of this state regulatory authority is important, given that speech may be the vehicle through which undue influence is exerted, depending on the context and manner in which it is conveyed. *See, e.g.*, *Dovydenas v. The Bible Speaks (In re The Bible Speaks)*, 869 F.2d 628, 645–46 (1st Cir. 1989) (rejecting a church's First Amendment defense against claims that it exerted undue influence to obtain gifts because the court's findings rested on the church's secular statements and actions).

There are, to be sure, definite limitations on what constitutes under California law a cognizable tort claim arising from facially religious conduct: No cause of action will be recognized where a plaintiff challenges the verity of religious statements or beliefs. "It is settled that inquiry into the truth or falsity of religious beliefs is foreclosed by constitutional guarantees of religious freedom and that the

United States Supreme Court's decision in *TXO Production Corp. v. Alliance Resource Corp*., 509 U.S. 443 (1993), the California Supreme Court dismissed its prior grant of review." *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 637 (1996). Accordingly, *Wollersheim II* and *Wollersheim I*—to the extent the earlier opinion was incorporated into the later one—remain good law.

courts may ask only whether the proponent of a particular religion holds his beliefs honestly and in good faith." *Hallinan v. Roman Catholic Archbishop of S.F. (In re Estate of Supple)*, 247 Cal. App. 2d 410, 414 (1966) (refusing to pass on the truth of religious statements alleged to have unduly influenced a testator's actions).  And the California Court of Appeal has refused to entertain actions that require the court to determine whether the actions of an individual not party to the lawsuit were induced by faith or coercive persuasion.  *Katz v. Superior Court*, 73 Cal. App. 3d 952 (1977) (overturning conservatorship orders granted to parents of members of the Unification Church who claimed their children were brainwashed).

Similarly, under the Religion Clauses, claims of intentional infliction of emotional distress against churches or other religious entities "based merely on threats of divine retribution" will not be allowed to proceed, *Molko*, 46 Cal. 3d at 1120, because such threats, like "'hell fire and damnation'" preaching, are protected religious speech and cannot form the basis of a claim for emotional distress, *Wollersheim I*, 212 Cal. App. 3d at 892–93.  Under California law, suits alleging purely emotional injury due to such religious expression are not permitted, given that "[i]t is one of the functions of many religions to 'afflict the comfortable.'"  *Id.* at 892.  And California courts have declined to recognize a cause of action for negligent infliction of emotional distress as a result of religiously motivated conduct because "religious organizations owe no duty to members or former members with respect to these forms of [emotional] injury." *Id.* at 901.

As noted above, the Japanese law under which the Church was sued permits liability for the infringement of another's rights based either on an intentional or negligent state of

mind.  *See* Minpō [Civ. C.] art. 709 (Japan).  To the extent
that Ohno's claim amounted to one for merely negligent
infliction of emotional distress as a result of facially religious
conduct, it may not have been cognizable under California
law.  But California courts have pronounced no bar to claims
for negligent infliction of *economic* injury, and Ohno clearly
asserted pecuniary losses as well as pain and suffering.
Moreover, the reason the California Court of Appeal has
given for barring recovery from religious entities for the
negligent infliction of emotional distress is not that such
liability necessarily offends the Religion Clauses, but rather
that religious organizations have no duty of care to avoid
causing their members emotional injury.  *See Wollersheim I*,
212 Cal. App. 3d at 900–01.  If such a duty of care exists
under Japanese law, this difference from California law does
not denote repugnance to a public policy embodied in the
Religion Clauses.

Ohno's claims, which relate to economic as well as
emotional injury, do not directly impugn the Church's
religious beliefs or teachings.  The Japanese trial court
rejected the Church's argument that the lawsuit was a purely
religious dispute and explicitly disavowed the notion that it
was scrutinizing the Church's beliefs, stating that there was
no "need to make a judgment about the religious teaching
itself, in order to make a determination about the validity of
[Ohno's] claim."  The court further recognized that
solicitation of donations by religious entities is legal and
protected from liability in Japan, so long as the methods used
are within the scope of what is "socially appropriate."  Where
inducement of donations incite anxiety, confusion, or terror,
however, such that the donation cannot be considered to be
based on the individual's free will, then a tort can be
established.  It was within these parameters that the Japanese

court adjudicated Ohno's claims. Far from being *so* divergent from domestic legal principles as to be repugnant to public policy, the causes of action underlying the Japanese judgment were generally similar to, although possibly broader than, those that would be cognizable under California law.

In other words, had Ohno alleged that she had been tortiously induced to donate hundreds of thousands of dollars to a church in California, she could have sued the religious entity or its officers here, too. Whether she would prevail on the particular facts of her case or whether the defendants could successfully raise constitutional defenses to any of her claims is a separate question, which we address next. We are not persuaded that the cause of action underlying the Japanese judgment is antithetical to California public policy regarding religious freedom.

### iv. Repugnancy of the Japanese Judgment

We turn next to the repugnancy of the judgment itself. The Church contends that the judgment is repugnant to public policy because it is incompatible with the Religion Clauses of the California and Federal Constitutions in two respects: First, the judgment necessarily involved an assessment by the court of the validity of the Church's religious teachings; and, second, the imposition of tort liability placed a burden on the Church's exercise of its religion without a compelling state interest in doing so. As will appear, the first contention is unsupported in the record. And the second cannot be grounds for declaring the judgment repugnant to public policy precisely because it presents a close question under California and federal law. In this context, where a repugnancy determination hinges on a definitive finding of conflict

between foreign and domestic law, the debatability of the validity of the Church's legal position is its downfall.

**a.**

Ohno's tort suit rests largely on fact-bound determinations regarding the nature of the actions that gave rise to her asserted injuries. Ohno contends that "the actual [Japanese] judgment was manifestly and explicitly concerned with conduct—the coercion, the overpowering of [her] own will, the deprivation of medications, the destruction of family relations, and the targeted fleecing of [her] assets." The Church, however, characterizes the Japanese judgment as imposing liability for Ohno's reactions to its "protected religious speech about the consequences of disobedience to God's commandments."

By its plain language, the Japanese judgment does appear to attach liability to the speech of a religious entity: The illegal act is described as "inducement" or "solicitation," based on "fraudulent and intimidating *statements*." But the Japanese trial court neither limited its focus to speech that was religious in nature nor rested its ruling on findings regarding the content of any religious speech at issue. The court made findings related to the Church's communications with Ohno regarding her living situation, contact with her family, and medical care, as well as pressure exerted on her to transfer funds to the Church, any or all of which may have been secular in nature. And while the judgment recounts the substance of some of the Church's teachings, the court's language suggests that it attributed the harms Ohno suffered not to the *content* of the Church's threats, but to the *context* in which they were made—that Ohno was isolated from her family, not taking medication for her depression, and

suffering from general ataxia.  The judgment states that the Church's conduct in soliciting money from Ohno, who was "under such a psychological condition," "incite[d] anxiety" and "cause[d] terror," such that the Transfers cannot be said to have been made of Ohno's free will.  The record does not support an inference that the Japanese court imposed liability because of the "specific motivating ideology," opinion, or perspective behind the Church's communication with Ohno, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), or a finding regarding the truth or falsity of the Church's religious beliefs, *see Ballard*, 322 U.S. at 87–88.

While the facts of Ohno's case may not be as egregious as those in *Wollersheim* and *Molko*, where the plaintiffs alleged they were physically coerced and deceived as to the identity of the church they were joining, the difference is a matter of degree, not kind.  To be sure, California tort law would require proof of elements not found in the Japanese judgment.   The tort of fraud under California law, for example, requires intent to defraud.  *See Molko*, 46 Cal. 3d at 1108; *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 259 (2011).  Similarly, to sustain a claim of intentional infliction of emotional distress in California, a plaintiff must show intent to cause, or reckless disregard for, emotional injury. *Wollersheim I*, 212 Cal. App. 3d at 881.   And under California law, "undue influence" consists in "the use, *by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him*, of such confidence or authority for the *purpose* of obtaining an unfair advantage over him" or "taking an unfair advantage of another's weakness of mind."  Cal. Civ. Code § 1575(1), (2) (emphasis added).

The Japanese trial court's judgment does not clearly establish either knowledge or intent on the part of Yasuma or Saints of Glory to "incite anxiety" or "cause terror." Facts in the record such as Yasuma's discouragement of the use of medication, Ohno's regular attendance at Church services, and the Church's oversight of her living situation permit an inference that Defendants were aware of Ohno's vulnerable mental and physical condition, and knew or should have known of the likelihood of causing her emotional harm or exerting undue influence. But the record reflects no discrete findings regarding the Church's knowledge of Ohno's depression and ataxia, whether Yasuma held a position of confidence and authority over Ohno, and whether the Church intended to take advantage of her.

For reasons we have surveyed, however, that the Japanese court did not find all the requisite elements of the causes of action for undue influence, fraud, or infliction of emotional distress under California law does not make the judgment *antithetical* to the basic precepts of tort law in this country, or to constitutional principles. Enforcing a defamation or libel judgment absent a finding of malice stands in direct tension with constitutional principles, because it punishes speech on the basis of content. In contrast, imposing tort liability absent a finding of intent, for actions that may or may not constitute protected religious conduct, does not give rise to the same stark clash of legal principles.

**b.**

Even if a court in the United States could find the requisite elements of Ohno's tort claims, the Church maintains, the Religion Clauses would bar recovery. But the record does not show that the Church has so clearly made out

a viable Free Exercise defense as to render the Japanese judgment antithetical to the fundamental principles underlying American protection of freedom of religion.

To invoke the protection of the Religion Clauses against a judgment in tort, the Church would have to demonstrate that imposing liability in damages substantially burdened its sincerely held religious beliefs or practices *and* that the state's justifications for that burden did not outweigh any infringement on the Church's religious freedom, under the applicable standard of scrutiny.[27] *See Hernandez v. Comm'r,* 490 U.S. 680, 699 (1989) ("The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the

---

[27] A "valid and neutral [state] law of general applicability," such as a domestic tort judgment similar to the Japanese judgment at issue here, that has the incidental effect of burdening the free exercise of religion no longer must withstand the "compelling interest" test articulated in *Sherbert v. Verner*, 374 U.S. 398, 403 (1963), to survive constitutional scrutiny. *Emp't Div. v. Smith*, 494 U.S. 872, 879, 885 (1990); *accord Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). "[A] religious objector has no federal constitutional right to an exemption from a neutral and valid [state] law of general applicability on the ground that compliance with that law is contrary to the objector's religious beliefs." *N. Coast Women's Care Med. Grp., Inc. v. San Diego Cnty. Superior Court*, 44 Cal. 4th 1145, 1155 (2008) (emphasis omitted). As we explain below, however, we presume for purposes of our analysis that the tort judgment at issue here, had it been rendered by a domestic court, would have to survive strict scrutiny. "Under strict scrutiny, 'a law could not be applied in a manner that substantially burden[s] a religious belief or practice unless the state show[s] that the law represent[s] the least restrictive means of achieving a compelling interest.'" *Id.* at 1158 (alterations in original) (quoting *Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 562 (2004)).

burden.”); *Smith v. Fair Emp’t & Hous. Comm’n*, 12 Cal. 4th 1143, 1166–67 (1996).

The threshold requirement for a defense based on the Religion Clauses is to show that one sincerely holds beliefs as religious views. *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994). Courts typically give credence to assertions of sincerely held religious beliefs in absence of any challenge to their sincerity or religious motives, and so long as they are not “so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause.” *Thomas v. Review Bd. of Ind. Emp’t Sec. Div.*, 450 U.S. 707, 715–16 (1981); *Shakur v. Schriro*, 514 F.3d 878, 885 (9th Cir. 2008) (taking the plaintiff’s assertion that his dietary needs were religiously motivated as prima facie evidence of sincere religious beliefs); *Malik*, 16 F.3d at 333 (giving credence to the plaintiff’s testimony regarding the reasons for his adoption of a Muslim name in absence of anything in the record challenging the sincerity of his religious beliefs). Construing the facts in the light most favorable to the Church, as we must on review of summary judgment, we presume that their actions were based on sincerely held religious beliefs.

Next, the Church would have to show that the order to pay damages to Ohno imposed a “substantial or, in other words, legally significant,” *Smith v. Fair Emp’t & Hous. Comm’n*, 12 Cal. 4th at 1166–67, burden on its exercise of religion. “[A] substantial burden must place more than an inconvenience on religious exercise”; it must have a “tendency to coerce individuals into acting contrary to their religious beliefs” or “exert[] substantial pressure on an adherent to modify his behavior and to violate his beliefs.” *Guru Nanak Sikh Soc’y of Yuba City  v. Cnty. of Sutter*, 456

F.3d 978, 988 (9th Cir. 2006) (internal quotation marks omitted).

To be sure, "the burden of tort damages is direct." *Paul*, 819 F.2d at 881. While a tort damages judgment does not criminalize the conduct for which liability is imposed, it effectively makes the challenged actions "unlawful." *Id*.

Here, however, it is questionable whether the Church could demonstrate that the burden imposed infringes on protected religious beliefs, not merely on conduct accompanied by such beliefs. *Employment Division v. Smith*, 494 U.S. 872 (1990), rejected the notion that "when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation." *Id*. at 882. Accordingly, that the Church's conduct may have been motivated by religious convictions does not shield it from tort liability for injuries engendered by its actions.

Even if we presume that the Church could show the imposition of tort liability to be a substantial burden on its religious exercise, it would still have to surmount a final hurdle: proving that its burden outweighed the governmental interest in the regulation of tortious activity. Again, construing the facts in favor of the Church, we presume that strict scrutiny would apply and the judgment could be upheld only upon demonstration that enforcement of tort law serves a compelling state interest. *Paul*, 819 F.2d at 882–83 & n.6 (citing *Sherbert v. Verner*, 374 U.S. 398, 403 (1963)). This presumption is appropriate, as a law of general application that implicates "'the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press'" remains subject to strict scrutiny. *San Jose*

*Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031 (9th Cir. 2004) (quoting *Smith*, 494 U.S. at 881). Because the Church contends that the imposition of tort liability here burdens its religious speech, this case might qualify as a "'hybrid'" one in an American court, triggering strict scrutiny under federal constitutional law. *See id.* at 1031 (quoting *Miller v. Reed*, 176 F.3d 1202, 1204 (9th Cir. 1999)).[28]

But we are not persuaded that a California court *could not* conclude that "the state's interest in allowing tort liability" as a means of protecting vulnerable individuals against undue influence, abuse of confidence for pecuniary gain, and fraud is compelling enough "to outweigh any burden" imposed on the Church's action. *See Molko*, 46 Cal. 3d at 1117 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972)). Nor are we persuaded that a California court would not deem tort law the least restrictive means of pursuing the state's compelling interests. This result is particularly likely given that the religious expression at issue here was targeted at Ohno specifically, rather than a more general audience. Holding the Church liable in this case may discourage it from

---

[28] The California Supreme Court has expressed skepticism about the notion that a "hybrid claim" implicating more than one constitutional right is entitled to heightened scrutiny under the Federal Constitution. *See N. Coast Women's Care Med. Grp., Inc.*, 44 Cal. 4th at 1156–57. Regardless, federal law does not control California's interpretation of the State Constitution. The California Supreme Court has not yet determined what standard should apply under the California Constitution to a valid, neutral state law of general applicability that burdens religious exercise. *See id.* at 1158. Whatever the California standard might be, it would not be stricter than strict scrutiny. *Id.* at 1159–60 (citing *Catholic Charities of Sacramento, Inc.*, 32 Cal. 4th at 559, 562). For our purposes, we assume that a tort judgment imposing liability for facially religious conduct would need to survive strict scrutiny under either the California or the Federal Constitution, or both.

soliciting funds in the manner pursued here, from individuals in a comparable psychological or medical state, or from otherwise exerting undue influence to obtain donations in the future. It does not, however, substantially inhibit Yasuma and Saints of Glory from practicing their religion or disseminating their teachings.

Construing the facts in the Church's favor, Ohno may well have failed to prevail in a California court on all her claims. But it is far from "clear-cut," *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986), and so certainly debatable, whether the Religion Clauses would bar an American court from issuing the same judgment had the suit been brought here. Moreover, as we cannot say, on the record before us, that a court in this country could not have rendered the judgment for Ohno had the events occurred entirely within the United States, then we certainly cannot conclude that a domestic court could not have issued the judgment where, as here, the challenged conduct was directed at an individual in Japan.

In sum, the Japanese award cannot be said to fall into the narrow class of judgments that must be refused enforcement because repugnant to public policy. Neither the law applied nor the particular judgment issued is "so antagonistic" to the public policy embodied in the Religion Clauses, *Crockford's Club Ltd.*, 203 Cal. App. 3d at 1406, or so "inherently vicious, wicked or immoral, and shocking to the prevailing moral sense," *Viewfinder*, 489 F.3d at 479–80, as to preclude recognition.[29]

---

[29] We likewise reject the Church's argument that the district court abused its discretion in denying the Church's motion for a continuance for the purpose of developing evidence. The Church's motion under former

## Conclusion

The roots of California's Uniform Act and its presumption that foreign-country money judgments are enforceable lie in principles of international comity:

> When an action is brought in a court of this country, by a citizen of a foreign country against one of our own citizens, to recover a sum of money adjudged by a court of that country to be due from the defendant to the plaintiff, and the foreign judgment appears to have been rendered by a competent court, having jurisdiction of the cause and of the parties, and upon due allegations and proofs, and opportunity to defend against them, and its proceedings are according to the course of a civilized jurisprudence, and are stated in a clear and formal record, the judgment is prima facie evidence, at least, of the truth of the matter adjudged; and it should be held conclusive upon the merits tried in the foreign

---

Federal Rule of Civil Procedure 56(f) was entirely lacking in specificity. As the district court noted, given that "[the Church] vigorously litigated the underlying proceedings in Japan, and even appealed the adverse judgment," counsel should have been able to identify with greater particularity what type of evidence they believed existed in the Japanese court records that could bolster their arguments. "[I]t is not enough to rely on vague assertions that discovery will produce needed, but unspecified, facts." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 535 (5th Cir. 1999) (internal quotation marks omitted). The evidence sought in a Rule 56(f) motion must be more than the object of mere speculation. *Margolis v. Ryan*, 140 F.3d 850, 854 (9th Cir. 1998); *see also Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008). The Rule 56(f) motion was therefore properly denied.

> court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that by the principles of international law, and by the comity of our own country, it should not be given full credit and effect.

*Hilton*, 159 U.S. at 205–06.   The Church has not demonstrated any such ground for non-recognition here.

Enforcement, by the district court, of the Japanese damages award did not render the imposition of tort liability domestic state action, subject to constitutional constraints.  Thus, the district court's order did not directly violate the Federal or California Constitution.  Nor is the Japanese judgment or the underlying cause of action so antithetical to the protections afforded by the Religion Clauses as to permit—let alone require—non-recognition under California's Uniform Act by reason of repugnancy to public policy.  For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**