Filed 3/22/21  Republic of Korea v. Ahn CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| REPUBLIC OF KOREA, | B302454 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. EC065866) |
| JOHN AHN et al., | ORDER MODIFYING OPINION (CLERICAL ERROR) |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:*

It is ordered that the opinion filed March 15, 2021 be modified as follows:

On page 33 of the opinion, first full paragraph and the first sentence, replace "pjudgment" with "post-judgment".

The modification does not change the judgment.

_____

*MANELLA, P. J.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| REPUBLIC OF KOREA, | B302454 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. EC065866) |
| JOHN AHN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Kralik, Judge.  Vacated and remanded with directions.

Fox Rothschild, John J. Shaeffer and Rom Bar-Nissim for Plaintiff and Appellant.

Raines Feldman, Howard K. Alperin and Robert M. Shore for Defendants and Respondents.

# INTRODUCTION

The Republic of Korea (ROK) obtained two judgments in Korean courts against respondent John Ahn. Together, the judgments awarded the ROK more than $2 million, plus 20 percent per year in post-judgment interest under Korean law. The ROK then brought this action in California to recognize the Korean judgments under our state's Uniform Foreign-Country Money Judgments Recognition Act (Code Civ. Proc., §§ 1713-1724; the Act).[1] It also sought to avoid allegedly fraudulent transfers of Ahn's assets.

Following discovery, the ROK moved for summary adjudication on its claim for recognition of the Korean judgments, and the trial court (Judge Benny Osorio) granted the motion. The matter then proceeded to a bench trial before another judge (Judge John Kralik) on the fraudulent conveyance claims. Following trial, the court determined that Ahn had engaged in fraudulent conveyances.

The trial court nevertheless believed that the Korean post-judgment interest rate was excessive and violative of the California Constitution's usury provisions. A then-recent Court of Appeal decision in *Hyundai Securities Co., Ltd. v. Lee* (2015) 232 Cal.App.4th 1379 (*Hyundai*) had already considered whether the Korean post-judgment interest rate was repugnant to public policy under section 1716 -- a finding that would have supported non-recognition of that element of the foreign judgment -- and determined it

_____

[1] Undesignated statutory references are to the Code of Civil Procedure.

2

was not. The trial court nevertheless concluded it had discretion to refuse to recognize the Korean post-judgment interest rate and declined to apply it to the judgment.

On appeal, the ROK argues that *Hyundai* required the trial court to recognize the Korean post-judgment interest rate. It further asserts that Judge Kralik had no power to reconsider Judge Osorio's grant of its motion for summary adjudication, which recognized the Korean judgments in their entirety.

Ahn contends the ROK has waived its right to appeal by accepting the benefits of the judgment (his payment of the trial court's judgment and an injunction the trial court had issued against him). He further argues the trial court properly exercised its discretion to reduce the Korean post-judgment interest rate as repugnant to public policy, and alternatively, that the court could have found that substantial doubt about the Korean court's integrity warranted non-recognition.

Initially, we conclude the ROK has not waived its right to appeal. We further conclude the trial court erred in refusing to recognize the Korean post-judgment interest rate, and hold: (1) whether a judgment is repugnant to public policy is a question of law; (2) the Korean post-judgment interest rate did not meet this demanding standard; and (3) the trial court did not find, and could not have found, that substantial doubt about the Korean court's integrity warranted non-recognition. Accordingly, we vacate the judgment and remand with instructions to recognize and apply the Korean post-judgment interest rate.

3

# BACKGROUND

A. *The Korean Actions*

In 1999 and 2000, the ROK entered into contracts with Allied-Tech Systems, Inc. and Paragon Systems, LLC, two American companies controlled by Ahn, for the purchase of certain supplies. Ahn jointly guaranteed the companies' obligations under the contracts. The ROK subsequently discovered defects in the goods delivered, applied for arbitration with the Korean Commercial Arbitration Board, and obtained separate damages awards against the companies. The awards were partly conditioned on the ROK's return of the defective goods. The ROK then instituted separate actions in the Seoul Central District Court against Ahn as a joint surety of the contracts between the ROK and the two companies.

1. *The First Korean Judgment*

In the action concerning Ahn's guarantee of Paragon's obligations, the Seoul Central District Court found in favor of the ROK and awarded it damages. However, the court accepted Ahn's argument that the ROK's right to payment should be conditioned on its return of the relevant goods to Paragon.

In April 2013, the Seoul High Court affirmed the judgment with modifications. Among other changes, the appellate court ruled that the ROK was entitled to payment even without returning the goods, viewing Ahn's contrary contention as an "abuse of right" and merely an attempt to evade his obligations. The court found that return of the

4

goods by the ROK would be difficult and costly, that the goods would be of minimal benefit to Paragon because they were defective and could not be used for their intended purposes, and that Paragon had failed to cooperate with the ROK to facilitate the goods' return. The court further rejected an apparently new argument by Ahn. Ahn noted that one of his relevant surety agreements originally listed an amount of only about $31,000 and that a Korean official later amended the amount to about $1.2 million (the amount of the relevant contract). He asserted this was done without his consent or knowledge and claimed he should be liable only for the original amount. Based on its review of the evidence, the Seoul High Court concluded the amount was corrected with Ahn's actual or constructive consent.

As modified by the appellate court, the first Korean judgment required Ahn to pay the ROK: (a) about $1.7 million in damages; (b) about $120,000 in pre-judgment interest; and (c) 20 percent per year in post-judgment interest from the date of the modified judgment until it was paid in full.[2] In July 2015, the Supreme Court of Korea rejected Ahn's final appeal on the merits.

2. *The Second Korean Judgment*

The ROK's second case, concerning Ahn's guarantee of Allied's obligations, followed a similar track. The Seoul

_____

[2] The post-judgment interest rate was apparently imposed under the Korean "'Special Law regarding Litigation Acceleration,'" which subjected judgments issued after May 2003 to an interest rate of 20 percent per year. (*Hyundai, supra*, 232 Cal.App.4th at 1386.)

Central District Court found in favor of the ROK and awarded it damages. It rejected Ahn's claim that the ROK would be entitled to payment only upon its return of the relevant goods to Allied. For essentially the same reasons the Seoul High Court provided in the first case, the Seoul Central District Court concluded Ahn's claim was an "abuse of right" and an attempt to evade his obligations.

In October 2014, the Seoul High Court affirmed the judgment with modifications. The modified judgment required Ahn to pay the ROK: (a) about $227,000 in damages; (b) about $23,700 in pre-judgment interest; and (c) 20 percent per year in post-judgment interest from the date of the modified judgment until it was paid in full. In July 2015, the Supreme Court of Korea rejected Ahn's final appeal on the merits.

### B. *The ROK's California Action*

#### 1. *The ROK's Complaint and the Grant of Summary Adjudication on the Claim for Recognition of the Korean Judgments*

In November 2016, the ROK filed this California action, seeking recognition of the Korean judgments under the Act. It also alleged that Ahn had engaged in fraudulent conveyances of his assets to evade payment, and sought

6

avoidance of the transfers and an injunction preventing further transfers of the assets.[3]

Following discovery, the ROK moved for summary adjudication of its claim for recognition of the Korean judgments under the Act. Ahn opposed the motion, arguing the Act did not apply to those judgments because they were unenforceable fines or penalties for purposes of section 1715. Alternatively, Ahn contended the court should not recognize the Korean judgments because grounds for non-recognition existed under section 1716, subdivisions (c)(1)(F) and (G).[4] He did not challenge the rate of post-judgment interest under the judgments.

The trial court (Judge Osorio) granted the ROK's motion for summary adjudication, concluding the Korean judgments were entitled to recognition under the Act. The court found the judgments did not represent fines or

---

[3] "'A fraudulent conveyance is a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim.'" (*Kirkeby v. Superior Court* (2004) 33 Cal.4th 642, 648.) A creditor who successfully asserts a fraudulent-conveyance claim may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." (Civ. Code, § 3439.07, subd. (a)(1).)

[4] Section 1716, subdivision (c)(1)(F) concerns judgments "rendered in circumstances that raise substantial doubt about the integrity of the rendering court with respect to the judgment." Subdivision (c)(1)(G) deals with judgments arising from proceedings that were "not compatible with the requirements of due process of law."

7

penalties, and found no evidence raising doubts about the Korean courts' impartiality or lack of due process in the Korean proceedings that would trigger the relevant grounds for non-recognition under section 1716.

### 2. *The Bench Trial on the Fraudulent Conveyance Claims*

Following Judge Osorio's retirement, the matter proceeded to a bench trial before Judge Kralik on the ROK's fraudulent conveyance claims. During Ahn's testimony at trial, he recounted that a company he owned had been involved in litigation against Lockheed Martin concerning the latter's alleged use of bribery and sexual favors to win (and deprive his company of) a large Korean government contract. According to Ahn, Lockheed ultimately agreed to pay his company $15 million. Other testimony presented at trial is not pertinent to this appeal. Following trial, the court found that Ahn had engaged in fraudulent conveyances of his assets with the intent to delay the ROK's recovery as a creditor.

### 3. *Briefing on the Korean Post-Judgment Interest*

Notwithstanding Judge Osorio's prior grant of summary adjudication on the ROK's claim for recognition of the Korean judgments, Judge Kralik sua sponte expressed concern over the judgments' post-judgment interest rate (20 percent per year), which was higher than the applicable

California rate of 10 percent per year.[5]  The court then solicited briefing on whether the Korean rate was enforceable.

The ROK's briefing argued the Korean post-judgment interest rate was compatible with due process and that the *Hyundai* court had expressly held that the Korean 20 percent post-judgment interest rate was not repugnant to public policy.[6]  The ROK further contended Judge Osorio had already recognized this component of the Korean judgments when he granted its motion for summary adjudication of both judgments.

Ahn's briefing argued, inter alia, that notwithstanding the holding in *Hyundai*, the trial court had discretion to reduce the Korean post-judgment interest rate to match California's rate, and provided various reasons the court should exercise that discretion, including:  (1) California law capped the rate at 10 percent; (2) California has a strong anti-usury policy; and (3) the Korean judgments were of "questionable validity."

Following a hearing, the trial court concluded that even under *Hyundai*, it had discretion to refuse to recognize

---

[5]  The California Constitution allows the Legislature to set the post-judgment interest rate "at not more than 10 percent per annum" (Cal. Const., art. XV, § 1), and section 685.010, subdivision (a) sets the applicable rate at 10 percent.

[6]  As discussed below, section 1716, subdivision (c)(1)(C) provides a ground for non-recognition of a foreign judgment if the judgment is "repugnant to the public policy of this state or of the United States."

the Korean post-judgment interest rate. [7] Believing that "20 percent is unseemly for a government to apply to its own citizens," the court declined to apply the Korean rate.

### 4. *The Trial Court's Judgment*

In September 2019, the trial court entered its judgment, ordering Ahn to pay the amount of the Korean judgments but applying a 10 percent interest rate up to the date of its judgment, rather than the Korean rate.[8] The judgment permitted the ROK to collect from any asset fraudulently conveyed and included an injunction that precluded additional transfers of Ahn's assets until he satisfied the judgment.

### 5. *The Trial Court's Statement of Decision*

In October 2019, the trial court issued a tentative statement of decision, and the parties filed their objections. On November 15, the ROK filed its notice of appeal from the

---

[7] The trial court expressed its disagreement with *Hyundai*'s holding that the Korean post-judgment interest rate was not repugnant to public policy, but acknowledged the case as binding precedent.

[8] The trial court applied California's post-judgment interest rate from the date of its judgment. The ROK does not challenge this aspect of the judgment. (See *Hyundai*, *supra*, 232 Cal.App.4th at 1392 [where court recognizes foreign judgment, California post-judgment interest rate applies from date of California judgment].)

10

judgment. The trial court issued its final statement of decision the following week.

As to the Korean post-judgment interest rate, the trial court noted *Hyundai*'s holding that it was not repugnant to public policy, but stated that it nevertheless believed it had discretion to refuse to enforce the Korean rate. Attempting to distinguish *Hyundai*, the trial court reasoned that because the ROK is "a government," the Korean post-judgment interest rate was "more akin to a penalty or a tax." It stated that the Korean rate was meant to "'accelerat[e]'" litigation, and "[w]hile it may not be a penalty of a nature that requires non-recognition [of] the judgment, the interest operates as a penalty against those who appeal from judgments." According to the trial court, "a further downward trend in the cost of funds to governmental entities" from the time of the decision in *Hyundai* made the Korean post-judgment interest rate "more akin to a penalty."

The trial court further stated that "certain inequitable aspects of the [first Korean] judgment" influenced its decision to deny enforcement of the Korean post-judgment interest rate. Pointing to the Korean appellate courts' decision that the ROK was entitled to payment regardless of its failure to return the defective goods to Paragon, the court stated this ruling relied "on only a claim that Paragon had not responded to a demand for arrangements . . . ." The court opined: "It is unclear why Paragon should have borne the ROK's cost of complying with the ROK's obligations under the judgment. Certainly, the original judgment on its terms provided only for contingent payment. Under such

11

circumstances, accrual of interest is fundamentally unjust." The court then pointed to the Korean courts' finding that Ahn actually or constructively agreed to the correction of the amount of his surety agreement. Disapproving of this finding, the court stated: "From the Seoul High Court's opinion[,] it appears that the evidence on which this inference is based was speculative, and would not be sufficient to establish the terms of a contract in a system of justice based on rules of evidence derived from English common law."

### 6. *Ahn's Satisfaction of the Judgment*

By late December 2019, Ahn had paid the full amount of the judgment, and the ROK accepted his payments. Ahn then filed an ex parte application, requesting that the trial court acknowledge his satisfaction of the judgment and discharge the injunction it had issued. Relying on *Heacock v. Ivorette-Texas, Inc.* (1993) 20 Cal.App.4th 1665, 1670 (*Heacock*), he claimed that acknowledging satisfaction of the judgment could not lead to the ROK's waiver of its right to appeal because the appeal "d[id] not jeopardize the amount already collected under the Judgment." The ROK opposed Ahn's application, asserting it could not voluntarily acknowledge Ahn's satisfaction of the judgment without risking a waiver of its right to appeal the denial of the post-judgment interest sought. Over the ROK's opposition, the trial court granted Ahn's application and acknowledged his satisfaction of the judgment.

12

## DISCUSSION

The ROK challenges the trial court's refusal to recognize the Korean post-judgment interest rate. Noting the *Hyundai* court's holding that the post-judgment interest rate applicable to Korean judgments is not repugnant to public policy under the Act, the ROK argues the trial court erred in concluding it had discretion to refuse to enforce that part of the judgments.

Ahn counters that the ROK waived its right to appeal by accepting the benefits of the judgment. He argues the trial court properly exercised its discretion to reduce the Korean post-judgment interest rate as repugnant to public policy; alternatively, Ahn suggests the court could have found that substantial doubt about the Korean court's integrity warranted non-recognition. As explained below, we conclude that the ROK has not waived its right to appeal, and that the trial court erred in refusing to recognize the Korean post-judgment interest rate.[9]

### A. *The Act*

The Act was enacted in 2007 to replace our state's Uniform Foreign Money-Judgments Recognition Act.

---

[9] In light of our conclusion, we need not address the ROK's argument that Judge Kralik was bound by Judge Osorio's summary-adjudication ruling. We observe, however, that under the general rule, "'one trial judge cannot reconsider and overrule an order of another trial judge.'" (*People v. Quarterman* (2012) 202 Cal.App.4th 1280, 1293.)

(*Manco Contracting Co. (W.L.L.) v. Bezdikian* (2008) 45 Cal.4th 192, 195 & fn. 1 (*Manco*); *Ohno v. Yasuma* (9th Cir. 2013) 723 F.3d 984, 990 (*Ohno*).)  It was modeled on the 2005 Uniform Foreign-Country Money Judgments Recognition Act (2005 Uniform Act) drafted by the National Conference of Commissioners on Uniform State Laws.[10] (*Hyundai*, *supra*, 232 Cal.App.4th at 1386; *Ohno*, *supra,* at 990.)  The 2005 Uniform Act's drafters believed that uniform and predictable foreign-judgment recognition statutes would satisfy foreign reciprocity concerns and encourage recognition of American judgments abroad.  (13 pt. II West's U. Laws Ann. (2005) U. Foreign-Country Money Judgments Recognition Act, Prefatory Note; see also *Manco*, *supra*, at 198 [stating similarly regarding 1962 Uniform Act]; *Bank of Montreal v. Kough* (N.D.Cal. 1977) 430 F.Supp. 1243, 1249 (*Bank of Montreal*) [purpose of Act's predecessor was to encourage foreign nations to recognize California judgments by "informing the[m] . . . of particular situations in which their judgments would definitely be recognized"].)

---

[10]    The 2005 Uniform Act was produced to update the 1962 Uniform Foreign Money-Judgments Recognition Act (1962 Uniform Act), on which California's Uniform Foreign Money-Judgments Recognition Act was based.  (*AO Alfa-Bank v. Yakovlev* (2018) 21 Cal.App.5th 189, 198.)  As of February 2021, 24 states and the District of Columbia have enacted some version of the 2005 Uniform Act.  (13 pt. II West's U. Laws Ann. (2005) U. Foreign-Country Money Judgments Recognition Act, Table of Jurisdictions.)  The enacted versions do not vary substantially from state to state.  (*Ohno*, *supra*, 723 F.3d at 990, fn. 8.)

14

The Act applies to foreign-country money judgments that are final, conclusive, and enforceable where rendered, and are not for taxes, for fines or other penalties, or in connection with domestic relations. (§ 1715, subd. (a) & (b).) The party seeking recognition of the foreign judgment has the burden to establish the judgment meets these conditions. (§ 1715, subd. (c).)

If the Act applies to the foreign judgment, the court must recognize and enforce the judgment unless a specified ground for non-recognition under section 1716 applies. (§ 1716, subd. (a).) As particularly relevant here, section 1716, subdivision (c)(1) lists several presumptive grounds for non-recognition, including that "[t]he judgment or the cause of action or claim for relief on which the judgment is based is repugnant to the public policy of this state or of the United States" or that "[t]he judgment was rendered in circumstances that raise substantial doubt about the integrity of the rendering court with respect to the judgment." (§ 1716, subds. (c)(1)(C) & (F).)

Under a former version of the Act, if a ground for non-recognition under subdivision (c) existed, the decision whether to recognize the judgment was a purely discretionary matter for the court. (See former § 1716, subd. (c) ["A court of this state is not required to recognize a foreign-country judgment if any of the following apply"].) In 2017, the Legislature amended the Act to make a judgment presumptively unenforceable if one of the grounds under current subdivision (c)(1) exists. (See Sen. Com. on Judiciary, Analysis of Assem. Bill No. 905 (2017-2018 Reg.

15

Sess.) p. 10 [noting specified grounds' tendency to involve "problematic elements that upset central principles of our justice system," and stating, "The amendments would create a presumption of nonrecognition when these circumstances exist. However, judicial discretion would still be retained for those circumstances where good cause exists"].) Under the current version of the Act, if one of the grounds listed in subdivision (c)(1) applies, the court "shall not recognize" the foreign judgment (§ 1716, subd. (c)(1)), unless "the party seeking recognition . . . demonstrates good reason to recognize the judgment that outweighs the ground for nonrecognition" (§ 1716, subd. (c)(2)). The party asserting that a specified ground for non-recognition applies has the burden of establishing it. (§ 1716, subd. (e).) If a court concludes that a foreign money judgment is entitled to recognition under the Act, the judgment's money award (or its denial of an award) is conclusive between the parties as would be a sister state's judgment that is entitled to full faith and credit, and is enforceable as a judgment rendered in this state. (§ 1719.)

B. *Rules of Interpretation*

"'Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the

16

enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.'"  (*Jarman v. HCR ManorCare, Inc.* (2020) 10 Cal.5th 375, 381.)

### C. *The ROK's Standing to Appeal*

Initially, Ahn contends the ROK waived its right to appeal by obtaining a permanent injunction against transfers by Ahn and the other defendants until the trial court's judgment was satisfied, and by later accepting his payment in satisfaction of the judgment.  "As a general rule, a party impliedly waives the right to appeal by voluntarily 'accepting the benefits' of the judgment.  The theory is that the right to accept the benefits of a judgment and the right to appeal are inconsistent, so that an election of the former must be deemed a renunciation of the latter."  (Eisenberg et al., Cal. Practice Guide:  Civil Appeals & Writs (The Rutter Group 2020) ¶ 2:331, citing *Lee v. Brown* (1976) 18 Cal.3d 110, 114; *American Alternative Energy Partners II v. Windridge, Inc.* (1996) 42 Cal.App.4th 551, 557.)  We conclude this rule does not preclude the ROK's appeal.

The ROK's acceptance of Ahn's payment falls under a recognized exception to the general waiver rule.  Under the relevant exception, a party who accepts payment of a money judgment does not waive its right to appeal if the party "is

17

simply attempting to augment the judgment and the relief sought would not jeopardize the amount already collected." (*Heacock*, *supra*, 20 Cal.App.4th at 1670; accord, Eisenberg et al., Cal. Practice Guide Civil Appeals & Writs, *supra*, ¶ 2:331 ["Where the judgment clearly establishes appellant's right to recover a money judgment but the amount is less than he or she is seeking, appellant may accept payment and still claim the larger amount on appeal"].) The ROK accepted sums to which it was indisputably entitled under the trial court's judgment, and the relief it seeks on appeal -- application of the Korean judgments' post-judgment interest rate -- does not jeopardize those sums. Thus, the ROK's acceptance of Ahn's payment does not imply a waiver of its right to appeal. (See *Heacock, supra*, at 1670.) Indeed, in seeking the trial court's recognition of his satisfaction of the judgment, Ahn conceded that the ROK's planned appeal "d[id] not jeopardize the amount already collected under the Judgment."

Ahn now asserts -- contrary to the position he took below -- that the ROK's appeal does jeopardize its entitlement to the sums it already accepted. First, Ahn contends that some of his arguments in defense of the trial court's ruling, if found meritorious, would require reversal of the entire judgment. Not so. "In deciding whether the [ROK's] appeal is inconsistent with having accepted the benefits of the judgment, we focus solely on the relief sought by the [ROK] . . . ." (*Heacock, supra*, 20 Cal.App.4th at 1670,

18

fn. 3.)[11] We do not focus on the arguments raised by Ahn, who never appealed the trial court's summary adjudication granting recognition of the Korean judgments, and who conceded below that the principal amount of the judgments was not in jeopardy.[12] As noted, there is nothing inconsistent between the ROK's requested relief -- enforcement of the Korean post-judgment interest rate -- and the ROK's collection of the principal amount of the judgments.

---

[11] In *Heacock*, the appellant claimed the trial court had erred in reducing a punitive damages award and sought reinstatement of the jury's verdict. (*Heacock, supra*, 20 Cal.App.4th at 1670.) Because the appellant was "*not* asking for a new trial on the punitive damage issue[,] which would call into question the amount of the judgment," the Court of Appeal held her prior collection of the full amount of the judgment was not inconsistent with her appeal. (*Ibid.*) It appears Ahn recognized the significance of *Heacock*'s holding below, as he cited it in support of his concession that the ROK's collection on the judgment did not preclude its appeal.

[12] Ahn cites *Satchmed Plaza Owners Assn. v. UWMC Hosp. Corp.* (2008) 167 Cal.App.4th 1034, in which the court held that a party who had exercised an option to purchase certain office units under the judgment could not appeal the judgment's denial of an option to purchase an assignment of lease interests in other units. (*Id.* at 1037-1038.) *Satchmed*, however, did not involve the money-judgment exception. Nor did it involve an unappealed summary adjudication ruling entitling the appellant to the accepted benefit or a prior concession by the respondent that the accepted benefit was not in jeopardy. *Satchmed* is therefore inapposite.

19

Additionally, Ahn argues that section 1716 requires enforcement of foreign judgments on an "'all-or-nothing basis,'" meaning that if we conclude that the ROK's appeal is *meritorious*, we would be required to reverse the entire judgment. Again, Ahn's premise is unsupported. Nothing in the statute expressly mandates either wholesale enforcement or wholesale rejection of a judgment containing a single severable allegedly noxious component, and we decline to read such a requirement into it. Such an approach would lead to unpredictable denials of recognition for judgments otherwise entitled to enforcement, contrary to the Act's purpose to provide certainty and encourage reciprocal recognition of domestic judgments by foreign nations. (See 13 pt. II West's U. Laws Ann., *supra*, U. Foreign-Country Money Judgments Recognition Act, Prefatory Note; *Manco*, *supra*, 45 Cal.4th at 198; *Bank of Montreal*, *supra*, 430 F.Supp. at 1249.) Not surprisingly, caselaw does not support Ahn's proposed approach. (See, e.g, *Hyundai*, *supra*, 232 Cal.App.4th at 1390-1391 [considering whether post-judgment interest rate portion of Korean judgment was unenforceable as repugnant to public policy]; *L'Institute Nat'l De L'Audiovisuel v. Kultur Int'l Films, Ltd.* (D.N.J. Jan. 31, 2012, No. 11-6309) 2012 U.S.Dist.LEXIS 12206, at *13 [considering whether attorney fees portion of French judgment was unenforceable as against public policy under New Jersey's version of 2005 Uniform Act].)

Ahn's contention that the ROK waived its right to appeal by obtaining an injunction as part of the judgment is similarly unsound. As noted, the general waiver rule applies

when a party voluntarily accepts the benefit of a judgment in renunciation of the party's right to appeal the judgment.  A prohibitory injunction, like the one the trial court issued, is "self-executing" (*Food & Grocery Bureau v. Garfield* (1941) 18 Cal.2d 174, 177); it requires no acceptance by the opposing party to have effect.  A court's grant of partial relief to a party, injunctive or otherwise, does not deprive the party of its right to appeal other aspects of the judgment.  Again, Ahn offers no authority for his suggestion, and we are aware of none.

Moreover, the injunction the trial court issued was merely a means to ensure the satisfaction of the judgment.  It afforded the ROK no substantive right and provided it no tangible benefit.  (See Eisenberg et al., Cal. Practice Guide Civil Appeals & Writs, *supra*, ¶ 2:336 [no waiver of right to appeal where appellant's action "does not result in receipt of anything of *tangible value*"]; *Menges v. Robinson* (1933) 132 Cal.App. 647, 651 [recording abstract of judgment did not waive right to appeal because it provided no tangible value, but only security for enforcement].)  The injunction therefore does not preclude the ROK's appeal.

D. *Refusal to Enforce the Korean Post-Judgment Interest Rate*

"Section 1719, subdivision (a) provides that recognition of a foreign-country money judgment has the same conclusive effect as does entry of a sister state judgment.  Upon entry of a sister state money judgment, that judgment includes the amount of interest accrued on the judgment

21

'computed at the rate of interest applicable to the judgment under the law of the sister state.'" (*Hyundai*, *supra*, 232 Cal.App.4th at 1390, quoting § 1710.25, subd. (a)(2).) As noted, the Korean judgments included an award of post-judgment interest at a rate of 20 percent per year, in accordance with Korean law. Accordingly, the trial court was required to recognize this portion of the Korean judgments, unless one of the statutory grounds for non-recognition existed. We discuss below the ground the trial court apparently relied on (repugnancy to public policy) and the additional ground Ahn advances on appeal (substantial doubt about the Korean courts' integrity). We conclude neither ground supported non-recognition.

1. *The Public Policy Ground for Non-Recognition*

a. *Governing Principles*

Under section 1716, subdivision (c)(1)(C), a judgment presumptively should not be recognized if "[t]he judgment or the cause of action or claim for relief on which the judgment is based is repugnant to the public policy of California or of the United States." (*Ibid.*) "California courts have set a high bar for repugnancy under the Uniform Act. The standard, rooted in the public policy exception to the comity doctrine at common law, . . . measures not simply whether the foreign judgment or cause of action is contrary to our public policy, but whether either is '*so* offensive to our public policy as to be "prejudicial to recognized standards of morality and to the general interests of the citizens."'"

22

(*Ohno, supra,* 723 F.3d at 1002, quoting *Java Oil Ltd. v. Sullivan* (2008) 168 Cal.App.4th 1178, 1189 (*Java Oil*).) "Put another way, the public policy exception codified at [section] 1716 . . . does not apply unless a foreign-country judgment or the law on which it is based is 'so antagonistic to California [or federal] public policy interests as to preclude the extension of comity.'" (*Ohno, supra,* at 1002, quoting *Crockford's Club v. Si-Ahmed* (1988) 203 Cal.App.3d 1402, 1406.)

The California standard is consistent with the intent of the 2005 Uniform Act's drafters and the standards applied by other jurisdictions in assessing foreign money judgments, which suggest the test of the public policy ground for non-recognition is demanding and rarely satisfied. (See 13 pt. II West's U. Laws Ann., *supra,* U. Foreign-Country Money Judgments Recognition Act, § 4 com. 8 [2005 Uniform Act retains predecessor's "stringent test" for public policy violation, under which "[p]ublic policy is violated only if recognition or enforcement of the foreign-country judgment would tend clearly to injure the public health, the public morals, or the public confidence in the administration of law, or would undermine 'that sense of security for individual rights, whether of personal liberty or of private property, which any citizen ought to feel'"]; *Sung Hwan Co., Ltd. v. Rite Aid Corp.* (2006) 7 N.Y.3d 78, 82 (*Sung Hwan*) [applying New York's version of 1962 Uniform Act; "[t]he public policy inquiry rarely results in refusal to enforce a judgment unless it is 'inherently vicious, wicked or immoral, and shocking to the prevailing moral sense'"]; *British Midland Airways, Ltd.*

23

*v. International Travel, Inc.* (9th Cir. 1974) 497 F.2d 869, 871 (*British Midland Airways*) [applying common law comity doctrine; "[i]t has long been the law that unless a foreign country's judgments are the result of outrageous departures from our own motions of 'civilized jurisprudence,' comity should not be refused"].)

Whether a judgment or cause of action is repugnant to public policy is a question of law we review de novo. (See *Ohno, supra,* 723 F.3d at 1002 [trial court's determination under section 1716 that neither judgment nor underlying cause of action was repugnant to public policy was legal conclusion subject to de novo review]; *People for Ethical Operation of Prosecutors etc. v. Spitzer* (2020) 53 Cal.App.5th 391, 409 (*Spitzer*) ["Courts of Appeal typically review important questions of public policy de novo because the appellate process is better suited to deciding such questions: We have more justices looking at the question with more time to review it"]; cf. *Ling v. P.F. Chang's China Bistro, Inc.* (2016) 245 Cal.App.4th 1242, 1252 ["In determining whether an arbitration award contravenes public policy, we review the trial court's decision de novo"]; *Bickel v. Sunrise Assisted Living* (2012) 206 Cal.App.4th 1, 9 ["the issue of whether the waiver of statutory rights [in an arbitration agreement] violated public policy presents a legal issue that we review de novo"]; *Tunstall v. Wells* (2006) 144 Cal.App.4th 554, 561 ["we review de novo whether the Trust's no contest clause violates public policy"].) The trial court's discretion applies only in the next stage of the inquiry: if the judgment or underlying cause of action is repugnant to public policy, the

24

court may nevertheless recognize the judgment if "the party seeking recognition . . . demonstrates good reason to recognize the judgment that outweighs the ground for nonrecognition."  (§ 1716, subd. (c)(2).)

### b. *Analysis*

Whether the Korean 20 percent post-judgment interest rate is repugnant to public policy is not a novel question.  In *Hyundai*, *supra*, 232 Cal.App.4th at 1390-1392, our colleagues in Division Five considered the issue under the previous version of section 1716 and held that the Korean rate did not "fit within the stringent test set forth by the uniform law for a public policy violation."  Like the ROK, the plaintiff company in *Hyundai* sought enforcement of a Korean judgment carrying a 20 percent per year post-judgment interest rate.  (*Id.* at 1384.)  The trial court granted the plaintiff's motion for summary judgment, recognizing the judgment.  (*Id.* at 1385.)  On appeal, the defendant argued that the Korean rate violated public policy, and that the court was therefore required to reduce it to 10 percent (the California rate).  (*Id.* at 1392.)  By contrast, the plaintiff contended the decision whether to recognize the post-judgment interest rate was a matter for the trial court's discretion.  (*Id.* at 1390.)

After describing the "'stringent test for finding a public policy violation,'" the court determined that "a usurious postjudgment interest rate does not fit this description of a law repugnant to the public policy of this state."  (*Hyundai*, *supra*, 232 Cal.App.4th at 1391.)  In support, the court

25

described precedent examining whether a usurious contractual interest rate violated California public policy such that it should not be enforced despite the contract's choice-of-law provision: "For example, in *Ury v. Jewelers Acceptance Corp.* (1964) 227 Cal.App.2d 11, 20, the court said that 'California does not have such a strong public policy against any and all contracts which would be usurious if they were made and to be performed here. . . .' The court noted that the California Constitution (now art. XV, § 1) exempts certain institutions from the usury laws and gives the Legislature the right to prescribe maximum limits for exempted lenders. [Citation.] 'A strong public policy, based on a settled concept of justice or morality would not be meshed with such alterable rates as the Legislature might choose to impose.'" (*Ibid.*)

The *Hyundai* court concluded: "It is true that the California Constitution limits the postjudgment interest rate to 10 percent. But the concept of a higher rate presented by a foreign law does not fit within the stringent test set forth by the uniform law for a public policy violation." (*Hyundai, supra*, 232 Cal.App.4th at 1391.) The court added: "It is not clear if the trial court exercised discretion in applying the postjudgment interest rate. But [the defendant] has not argued that the trial court failed to exercise its discretion or abused its discretion. Instead, he argued that the trial court was legally compelled to reduce the postjudgment interest rate to 10 percent. We reject this contention." (*Id.* at 1391-1392.)

We agree with *Hyundai* that the Korean 20 percent post-judgment interest rate is not "repugnant to public policy." While it is significantly higher than the rate allowed in this state, we cannot say that the Korean rate is "'*so* offensive to our public policy as to be "prejudicial to recognized standards of morality and to the general interests of the citizens"'" (*Ohno*, *supra*, 723 F.3d at 1002, quoting *Java Oil*, *supra*, 168 Cal.App.4th at 1189), is "'inherently vicious, wicked or immoral, and shocking to the prevailing moral sense'" (*Sung Hwan*, *supra*, 7 N.Y.3d at 82), represents an "outrageous departure[] from our own motions of 'civilized jurisprudence'" (*British Midland Airways*, *supra*, 497 F.2d at 871), or meets any other accepted articulation of the standard for repugnancy to public policy.

Pointing to *Hyundai*'s statement that the defendant had not faulted the trial court's exercise of discretion or lack thereof, Ahn claims the trial court here retained discretion to find the Korean post-judgment interest rate was repugnant to public policy. We disagree. As noted, whether a judgment is repugnant to public policy presents a legal question we review de novo. (See *Ohno*, *supra*, 723 F.3d at 1002; *Spitzer*, *supra*, 53 Cal.App.5th at 409.) *Hyundai*'s relevant language may have referenced the plaintiff's argument that recognizing the Korean post-judgment interest rate was a matter for the trial court's discretion, which argument presumably relied on the trial court's discretion to enforce a

27

judgment *despite* its being repugnant to public policy.[13] Regardless, the *Hyundai* court was clear that the Korean post-judgment interest rate "d[id] not fit within the stringent test . . . for a public policy violation" (*Hyundai, supra*, 232 Cal.App.4th at 1391), and as discussed, we agree.

The justifications the trial court offered in support of its decision to deny recognition to the Korean post-judgment interest rate are unpersuasive. First, the court stated that because the ROK is "a government," the Korean post-judgment interest rate was "more akin to a penalty or a tax," that the rate was meant to "'accelerat[e]'" litigation, and that "[w]hile it may not be a penalty of a nature that requires non-recognition [of] the judgment, the interest operates as a penalty against those who appeal from judgments." The court also stated that "a further downward trend in the cost of funds to governmental entities" from the time of the *Hyundai* decision made the Korean post-judgment interest rate "more akin to a penalty."

Yet the ROK obtained the Korean judgments against Ahn as a party to a contract, not as a sovereign, and received the same post-judgment interest rate to which a private plaintiff would have been entitled -- indeed, the same rate the plaintiff company in *Hyundai* received. While the Korean post-judgment interest rate serves to incentivize prompt payment of the judgment, so too does California's

---

[13] The version of section 1716 applicable at the time instructed that if a foreign judgment was repugnant to public policy, the court was "not required" to recognize it. (Former § 1716, subd. (c).)

28

post-judgment interest rate.  (See *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 350 ["the judgment rate of interest is a 'judicial tool' for enforcing judgments because it reduces the incentive to delay payment"].)  And like California's post-judgment interest rate, the Korean rate does not depend on the cost of funds to the particular plaintiff.  (See Code Civ. Proc., § 685.010, subd. (a) ["Interest accrues at the rate of 10 percent per annum on the principal amount of a money judgment remaining unsatisfied"].)

Second, the trial court stated that "certain inequitable aspects of the [first Korean] judgment" influenced its decision to deny enforcement of the Korean post-judgment interest rate.  The court pointed to the Seoul High Court's ruling that the ROK's right to payment would not be conditioned on its return of the defective goods to Paragon, and asserted that the ruling relied "on only a claim that Paragon had not responded to a demand for arrangements . . . ."  Disapproving of the ruling, the trial court stated, "Under such circumstances, accrual of interest is fundamentally unjust."[14]  The court pointed additionally to the Korean courts' finding that Ahn actually or constructively agreed to the correction of the amount of his surety agreement, and opined that it was unsupported by the evidence.

---

[14]    As noted, the Korean post-judgment interest ran from the date of the Seoul High Court's modified judgment.

29

None of these purportedly inequitable aspects of the first Korean judgment justified rejecting the Korean post-judgment interest. The trial court's analysis amounts to mere disagreement with the Korean courts' rulings. Whether right or wrong in a California court's view, foreign judgments are entitled to recognition unless they meet a statutory ground for non-recognition. (See *Pariente v. Scott Meredith Literary Agency, Inc.* (S.D.N.Y. 1991) 771 F.Supp. 609, 617 [applying New York's version of 1962 Uniform Act; "'the courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness'"]; cf. *Bank of America v. Jennett* (1999) 77 Cal.App.4th 104, 118 ["a sister state judgment is entitled to full faith and credit 'even as to matters of law or fact erroneously decided'"].)

Moreover, the matters the trial court identified in the first judgment have no clear relationship to the post-judgment interest element of that judgment and thus cannot inform whether that component was repugnant to public policy.[15] Finally, we observe that in ruling that the ROK's right to payment would not be contingent on its return of the defective goods, the Korean courts did not rely solely on a claim that Paragon had not responded to a demand for arrangements. Instead the Korean courts concluded that in light of the cost to the ROK of returning

_____

[15] The integrity of the Korean proceedings had been litigated before Judge Osorio, who found no evidence raising doubts about the Korean courts' impartiality. Judge Kralik did not purport to disturb Judge Osorio's ruling.

the defective goods, the negligible benefit to Paragon of receiving goods of minimal value, and Paragon's lack of cooperation, Ahn's insistence on simultaneous performance was an "abuse of right" and merely an attempt to evade his own obligations.

Ahn argues that delay in the enforcement of the Korean judgments due to the ROK's "litigation tactics" supported the trial court's refusal to enforce the Korean post-judgment interest rate. He asserts the ROK unreasonably delayed filing its recognition action and unnecessarily combined it with fraudulent conveyance claims against him. Initially, we observe that Ahn did not raise this argument below, and the trial court did not rely on it. Moreover, we see nothing unreasonable in the 16-month interval between the finality of the Korean judgments and the ROK's California action, especially given the ROK's need to investigate the condition of Ahn's assets amid his attempts to shield them from enforcement. Nor was it unreasonable for the ROK to concentrate its enforcement efforts in a single action. It was Ahn, not the ROK, who delayed the payment of the Korean judgments through his (permissible) litigation efforts to avoid their recognition and his (impermissible) efforts to delay or avoid his obligations through fraudulent transfers. In short, the Korean post-judgment interest rate was not repugnant to public policy.

## 2. *Substantial Doubt About Foreign Court's*
## *Integrity as Ground for Non-Recognition*

A court should presumptively refuse to recognize a foreign judgment if it "was rendered in circumstances that raise substantial doubt about the integrity of the rendering court with respect to the judgment." (§ 1716, subd. (c)(1)(F).) According to the drafters of the 2005 Uniform Act, this ground "requires a showing of corruption in the particular case that had an impact on the judgment that was rendered." (13 pt. II West's U. Laws Ann., *supra*, U. Foreign-Country Money Judgments Recognition Act, § 4 com. 11.)

Ahn argues the trial court could have relied on this ground to refuse enforcement of the Korean post-judgment interest rate. He claims the evidence supported a finding that the ROK wanted to obtain "revenge" against him because he had embarrassed it with his company's prior lawsuit against Lockheed Martin.[16] We are unpersuaded.

The trial court did not rely on this ground in denying enforcement of the Korean post-judgment interest. Neither in his comments at the hearing nor in his statement of decision did Judge Kralik cite this ground as a reason to refuse enforcement. Moreover, in granting summary

---

[16] The parties do not directly address whether section 1716, subdivision (c)(1)(F)'s ground for non-recognition presents a question of fact or law. For purposes of this discussion, we will assume it presented a question of fact for the trial court, as Ahn appears to suggest.

32

adjudication, Judge Osorio expressly rejected Ahn's argument regarding the integrity of the Korean courts, finding no evidence raising doubts about their impartially.

Ahn nevertheless urges us to infer the trial court relied on this ground in refusing to enforce the pjudgment interest rate. Noting that the court filed its statement of decision after the ROK filed its notice of appeal, he argues the court was therefore without jurisdiction to file the statement of decision. Ahn argues we should thus disregard the statement of decision and apply the implied findings doctrine. Under that doctrine, an appellate court must infer that the trial court made all factual findings necessary to support the judgment. (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.) "The question then becomes whether substantial evidence supports the implied factual findings." (*Ibid*.)

Even disregarding the trial court's statement of decision, however, the implied findings doctrine is of no benefit to Ahn. The doctrine requires that we infer findings necessary to support the judgment. We need not -- and will not -- infer a finding contradicted by the judgment. The trial court's judgment recognized and enforced the foreign judgments, save for their post-judgment interest component. A finding that the Korean courts lacked integrity because they might have been intentionally assisting the Korean government in retaliating against Ahn would have placed the entire judgment in question. Under no circumstances would it have justified rejecting only the Korean statutory

33

post-judgment interest rate. The implied findings doctrine is therefore inapplicable to Ahn's contentions.

Moreover, Ahn's proposed finding would have been unsupported. The Korean judicial system is generally considered to be fair. (See *Samyang Food Co. v. Pneumatic Scale Corp.* (N.D.Ohio Oct. 21, 2005, No. 5:05-CV-636) 2005 U.S.Dist.LEXIS 25374, at \*17 ["The Korean judicial system provides substantially the same substantive and procedural due process protections as those afforded by Ohio"]; *LG Display Co., LTD. v. Obayashi Seikou Co., LTD* (D.D.C. 2013) 919 F.Supp.2d 17, 32 ["U.S. courts routinely enforce judgments rendered by Korean courts"].) Ahn's theory -- that due to his prior embarrassment of the ROK's government, the government enlisted three levels of its judiciary to exact revenge on him in two separate cases -- is unsupported speculation. To the extent Ahn relies on certain rulings by the Korean courts -- e.g., ordering that the ROK's right to payment would not be conditioned on its return of the defective goods and finding that Ahn had actually or constructively consented to the correction of the amount of his surety agreement -- his disagreement does not create substantial doubt about the integrity of the Korean courts. (See *De Fontbrune v. Wofsy* (N.D.Cal. 2019) 409 F.Supp.3d 823, 845 [rejecting lack-of-integrity ground under § 1716; "'[T]his Court will not attempt to insert itself into the shoes of the [French] court and usurp its decision-making'"].)

Ahn offers no other ground for non-recognition of the Korean post-judgment interest rate; nor did the trial court offer any other ground in support of its decision.

34

Accordingly, we conclude the trial court was required to apply that component of the Korean judgments.

## DISPOSITION

The judgment is vacated and the matter remanded to the trial court with instructions to apply the Korean judgments' post-judgment interest rate up to the date of the original California judgment. The ROK is awarded its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

COLLINS, J.